SUSAN ISSLER *v.* JAMES ISSLER
(SC 16017)

Borden, Berdon, Katz, McDonald and Peters, Js.

Argued June 4—officially released August 17, 1999

*Steven D. Ecker*, with whom were *Shirley V. Hoogstra* and, on the brief, *Howard A. Jacobs*, for the appellant (defendant).

*Kathleen A. Hogan*, with whom, on the brief, was *Arnold H. Rutkin*, for the appellee (plaintiff).

*Opinion*

BERDON, J. In this certified appeal, the Appellate Court affirmed the trial court's order finding the defendant husband in contempt of court for wilfully disobeying the alimony obligations set forth in a separation agreement. We reverse the Appellate Court's judgment.

All of the pertinent facts are undisputed. The defendant, James Issler, and his wife, the plaintiff, Susan

Issler, who were married in 1969, entered into a written separation agreement on June 30, 1995 (agreement). Shortly thereafter, the court, *Axelrod, J.*, found the agreement to be fair and equitable and incorporated it into the judgment of dissolution.

The agreement is very sophisticated. Both parties agree that it was designed to calibrate the defendant's alimony payments so that they reflect the intricate structure of the compensation that he receives as the president of H. H. Brown Shoe Company (H. H. Brown), a subsidiary of Warren Buffett's Berkshire Hathaway. Each year, the defendant receives both a base salary and incentive compensation. His incentive compensation— which is based on the profits of H. H. Brown—comprises the lion's share of his income.[1]

H. H. Brown is generally unable to determine its profits for a given year until March of the following year. Every March, an independent certified public accountant releases a letter (accountant's letter) that conclusively determines the company's profits for the prior year.[2] Because the defendant's incentive compensation is based on the profits of H. H. Brown, his incentive compensation for a given year cannot be determined until the accountant's letter is released in March of the

---

[1] At the time of the dissolution, the defendant's annual base salary was $350,000 and his most recent incentive compensation payment was $952,643.

[2] The defendant's compensation agreement with H. H. Brown contains the following provision: "Your compensation . . . will consist of an annual salary . . . plus [incentive compensation] based on 5% of the combined annual adjusted consolidated profits, before income taxes, of [H. H. Brown]. . . . The profits of [H. H. Brown] will be determined, in accordance with generally accepted accounting principles, by our auditors at the end of the calendar year. It usually takes until the following March to get the final results."

The accountant's letter is always released in the first quarter of each year, usually in late February or March. In the interest of clarity, we will assume that the letter is always released in March.

following year. In short, the bulk of the defendant's income for a given year is not known until several months after the end of that year.[3]

The agreement reflects the structure of the defendant's compensation. Pursuant to article 2.2 of the agreement, the plaintiff is entitled to a fixed percentage of the defendant's "gross earnings."[4] Article 2.5 provides that, "[w]hile the [defendant] is employed by [H. H. Brown], the [defendant's] gross earnings will be determined by H. H. Brown's independent certified public accountant's letter which computes the compensation of [the defendant]."[5]

In addition, the parties structured the annual recalculation of alimony payments around the accountant's letter.[6] Pursuant to article 2.6 of the agreement, the

[3] While the defendant's income for a given year is not known until the following March, the defendant may elect to receive a portion of his anticipated incentive compensation during the course of that year, based upon estimated profits. Between 1990 and 1995 the defendant deferred receipt of an average of 47 percent of his earnings until after the accountants had completed their annual review. At the time when the parties were finalizing the agreement in June, 1995, the defendant had not yet received any incentive compensation whatsoever for services that he had rendered in 1995.

[4] More specifically, article 2.2 of the agreement contains the following alimony schedule: "a. The [defendant] shall pay to the [plaintiff] alimony in an amount equal to 33 1/3% of his gross earnings up to $750,000.00 gross in any calendar year in which he has an obligation to pay alimony.

"b. The next $100,000.00 of gross earnings of the [defendant's] shall not be subject to increase his alimony.

"c. The [defendant] shall pay to the [plaintiff] as additional alimony 22% of the [defendant's] gross earnings between $850,001 and $1,250,000.

"d. The [defendant] shall pay to the [plaintiff] as additional alimony 15% of the [defendant's] gross earnings between $1,250,001.00 and $1,500,000.00.

"e. The [defendant] shall pay to the [plaintiff] as additional alimony 15% of the [defendant's] gross earnings above $1,500,000.00."

[5] Article 2.2 of the agreement generically defines "gross earnings" to include "all income earned by the [defendant], wherever he may be employed . . . ." Article 2.5 defines "gross earnings" within the more specific context of the defendant's employment with H. H. Brown.

[6] Article 2.6 of the agreement provides in pertinent part: "A. [T]he base alimony payments to the [plaintiff] shall be $338,000 per year using $1,250,000.00 as the [defendant's] assumed gross earnings for 1995. From

parties assumed that the defendant's gross earnings in 1995—the year in which the agreement was executed—would be $1,250,000 (estimate). Based upon this estimate, the defendant would have owed the plaintiff $338,000 in alimony for 1995 if the marriage had been dissolved as of January 1, 1995.[7] Because the parties remained married for exactly one half of 1995, however, the defendant was obligated to pay only one half of this amount, spread out over the six remaining months of 1995. This worked out to $28,166.67 per month.

The estimate was, of course, nothing more than an approximation of the husband's gross earnings for 1995. This is where the accountant's letter comes in. The

July 1, 1995 through December 31, 1995, the [plaintiff] shall receive 1/2 of $338,000 or $28,166.67 per month. Within 5 days of March 31, 1996, which is when the accountants will have completed the annual H. H. Brown audit and prepared the calculation of [the defendant's] gross earnings, the [defendant] shall send to the [plaintiff] the [accountant's] letter indicating the [defendant's] gross earnings for the prior year. For the period from July 1, 1995, to December 31, 1995, the total alimony due shall be determined as follows: the total alimony due pursuant to [article] 2.2 [see footnote 4] for the year 1995 multiplied by fifty percent (50%) minus the payments made for the period from July 1, 1995, to December 31, 1995. The differential payment shall be paid to the [plaintiff] by April 30, 1996.

"In the event the [defendant's] monthly payments based upon the foregoing formula were over-payments, the [plaintiff's] alimony paid from April through December of 1996 shall be reduced by 1/9 each month of that overage.

"B. The base alimony payments for each calendar year shall be determined by the gross earnings of the [defendant] for the prior year. From January 1 through March 31 of each year commencing 1996, the monthly amount shall be $28,166.67 per month based on assumed earnings of $1,250,000.00 per year. If the [defendant's] gross earnings are more than $1,250,000.00 he shall pay to the [plaintiff] . . . the difference between the total base alimony payments and the total alimony to be paid hereunder. The differential payment shall be paid to the [plaintiff] by April 30 of each year. In the event the [defendant's] monthly payments for January, February and March of each year based on $1,250,000.00 of assumed gross earnings were overpayments after the computation of his gross earnings by the certified public accountants, the [plaintiff's] alimony paid from April through December of that year shall be reduced by 1/9 each month of that overage. . . ."

[7] See footnote 4 of this opinion for the formula used to derive this amount.

agreement provides that, "[w]ithin five days of March 31, 1996, which is when the accountants will have completed the annual H. H. Brown audit and prepared the calculation of the defendant's gross earnings, [the defendant] shall send to the [plaintiff] the [accountant's] letter indicating the [defendant's] gross earnings for the prior year." If the accountant's letter discloses that the estimate was too low, then the defendant must pay the plaintiff the entirety of the difference between the estimate and his actual gross earnings by April 30, 1996. If, on the other hand, the letter discloses that the estimate was too high, then the defendant is entitled to reduce his alimony payments for each of the remaining nine months between April, 1996, and December, 1996, by one ninth of the difference between the estimate and his actual gross earnings.

Under the agreement, this cycle continues every year until the occurrence of one of several specified events that are not relevant to the present appeal. Each year, the estimate is replaced with the defendant's actual gross earnings for the prior year. Significantly, the annual recalculation occurs in April (i.e., after the accountant's letter has been released), rather than in January (i.e., after the defendant's taxable income is known).

At the time of the dissolution, the plaintiff's attorney canvassed his client in order to assure the court that she understood the terms of the agreement. During this canvass, the following colloquy took place:

"Q. . . . [Y]ou're aware that we have . . . agreed to a definition of gross earnings?

"A. Yes. . . .

"Q. And you understand . . . that where [the defendant is] employed now, H. H. Brown, every year *an*

*independent certified audit is done and that's how he knows what he has 'earned,'* and you're going to receive a copy of that; you understand that?

"A. Yes.

"Q. And attached to this agreement . . . is his compensation agreement [with H. H. Brown], which you are familiar with; are you not?

"A. Yes.

"Q. The alimony shall be based *only on these earnings* or wherever he's employed later and does not include any . . . investment income; do you understand that?

"A. Yes. . . .

"Q. . . . [W]e're using [the estimate] to—to start the alimony and then, *depending on [the accountant's] letter* . . . [the defendant] may owe you a lump sum, or you may owe him some money back which he would take back . . . over the next nine months after you receive that letter; do you understand that?

"A. Yes. Yes." (Emphasis added.)

Every month between July, 1995, and March, 1996, the defendant made alimony payments to the plaintiff in the amount set forth in the agreement, namely, $28,166.67. Upon receiving the accountant's letter in 1996, the defendant claimed that the estimate substantially overstated his gross earnings for the prior year.[8] In a letter to the plaintiff dated eleven days prior to the deadline contained in the agreement, the defendant set forth a comprehensive explanation of how he would

---

[8] As discussed previously, the parties had estimated that the defendant's gross earnings in 1995 would be $1,250,000. According to the defendant, the accountant's letter revealed that his gross earnings in 1995 were, in fact, $842,354. For this reason, the defendant argues that he was entitled to recover $407,646, the difference between the estimate and the amount set forth in the accountant's letter.

comply with the terms of the agreement by reducing the alimony payments for the remainder of 1996.[9] Beginning in April, 1996, he reduced his alimony payments to $13,500.01 per month.

---

[9] The letter provided as follows:

"March 25, 1996

Susan Issler
45 Turkey Hill Road
Westport, CT 06880
Dear Susan,

As directed in our divorce agreement dated June 30, 1995, [articles] 2.5 and 2.6A, I am sending you this letter with attachments which are copies of the letter sent to me from [H. H. Brown's] outside audit firm. The attachments show my gross earned income for 1995 and the calculations which support the total figure. It has been prepared consistent with the compensation agreement labeled Exhibit A in the divorce agreement. In addition, I have enclosed a copy of my 1995 Federal Tax return, as required in [article] 2.3.

1996 BASE ALIMONY PAYMENTS

According to [article] 2.6B, the base alimony payments for the calendar year 1996 is determined by my gross earnings for 1995. Since my income for 1995 was $842,354, only sections a and b of [article] 2.2 apply. The calculation for 1996 monthly alimony payments is as follows:

| Source | Gross Earnings | % | Annual Alimony | Monthly Alimony |
|--------|----------------|-----|----------------|-----------------|
| 2.2a | $750,000 | 33.33 | $250,000 | $20,833.34 |
| 2.2b | 92,354 | 0 | 0 | |
| Total | $842,354 | – | $250,000 | $20,833.34 |

ADJUSTMENTS TO BASE ALIMONY 1996

A. Overpayment of Alimony Jan-Mar 1996

According to [article] 2.6B, I have paid you $28,166.67 per month for the first three months of 1996, which was based on assumed earnings of $1,250,000 as agreed. Since these monthly payments resulted in an overpayment, the alimony payments from Apr-Dec 1996 will be reduced by 1/9 each month of the overage. The calculation is as follows:

| | | |
|---|---|---|
| Actual Payments | Jan-Mar 1996 = $28,166.67 x 3 = | $84,500.01 |
| Alimony Due | Jan-Mar 1996 = 20,883.34 x 3 = | −62,500.02 |
| | Total Overpayment 1996 | −21,999.99 |
| | 1/9 Adjustment | /9 |
| | Reduction in Monthly Alimony | $−2,444.44 |
| | Apr-Dec 1996 | |

B. Overpayment of Alimony Jul-Dec 1995

According to [article] 2.6A, alimony payments for the second half of 1995 were based on assumed gross earnings for 1995 of $1,250,000. Total alimony due for Jul-Dec 1995 was agreed to be determined as total alimony computed according to [article] 2.2, multiplied by 50%, minus payments I made. 1/9

On May 2, 1996, the plaintiff moved to have the defendant held in contempt of court on the ground that he should have recalculated the estimate of his 1995 gross earnings by reference to his taxable income for that year, *not* by reference to his earnings as reflected in the accountant's letter that was released in March of 1996. On September 20, 1996, the trial court, *Munro, J.*, found the defendant in contempt for reducing his alimony payments to $13,500.01. The Appellate Court affirmed the trial court's order of contempt. *Issler* v. *Issler*, 50 Conn. App. 58, 72, 716 A.2d 938 (1998). This certified appeal followed.[10] Because we conclude that the defendant paid precisely what he should have paid, we reverse the judgment of the Appellate Court.

We begin with our standard of review. The agreement "was ordered incorporated . . . into the dissolution

of the total overage was to be offset against alimony payments paid from Apr-Dec 1996. The calculation is as follows:

| | |
|---|---|
| Alimony Due for the Full Year 1995 | $250,000.00 |
| Adjustment for Second Half of Year | × 50% |
| Total Alimony Due for 1995 | $125,000.00 |
| Alimony Payments Made Jul-Dec 1995 | −169,000.02 |
| Overpayment 1995 | $ -44,000.02 |
| 1/9 Adjustment | /9 |
| Reduction in Monthly Alimony Apr-Dec 1996 | $ −4,888.88 |

TOTAL MONTHLY ALIMONY PAYMENT DUE APR-DEC 1996

| | |
|---|---|
| 1996 Monthly Base Alimony Payment | $20,833.34 |
| Overpayment Adjustment Jan-Mar 1996 | −2,444.44 |
| Overpayment Adjustment Jul-Dec 1995 | −4,888.89 |
| Total Monthly Payment Due Apr-Dec 1996 | $13,500.01 |

Based on these calculations, I am adjusting the wire transfer authorization to this amount for the April, 1996 payment.

Also, I have executed and returned the quit-claim deed on the Florida condominium to your attorney.

Sincerely,

Jim"

[10] We granted certification limited to the following issue: "Did the Appellate Court properly affirm the trial court's judgment of contempt of court?" *Issler* v. *Issler*, 247 Conn. 921, 722 A.2d 810 (1998).

decree. A judgment rendered in accordance with such a stipulation of the parties is to be regarded and construed as a contract. See *Kenworthy* v. *Kenworthy*, 180 Conn. 129, 131, 429 A.2d 837 (1980); *Albrecht* v. *Albrecht*, 19 Conn. App. 146, 152, 562 A.2d 528, cert. denied, 212 Conn. 813, 565 A.2d 534 (1989)." *Barnard* v. *Barnard*, 214 Conn. 99, 109, 570 A.2d 690 (1990). Accordingly, "[o]ur resolution of the [plaintiff's] claim is guided by the general principles governing the construction of contracts. A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 686, 697 A.2d 1137 (1997). Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . *Levine* v. *Massey*, 232 Conn. 272, 277, 654 A.2d 737 (1995); see *Mulligan* v. *Rioux*, 229 Conn. 716, 740, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995); *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 158, 595 A.2d 872 (1991); *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.*, 203 Conn. 123, 131, 523 A.2d 1266 (1987); *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981)." (Internal quotation marks omitted.) *Pesino* v.

*Atlantic Bank of New York*, 244 Conn. 85, 91–92, 709 A.2d 540 (1998).

"When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct . . . . Practice Book § 4061; *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 752, 601 A.2d 1005 (1992); *Zachs* v. *Groppo*, 207 Conn. 683, 689, 542 A.2d 1145 (1988); *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53, 607 A.2d 424 (1992). . . . Under the circumstances of this case, because the trial court relied solely upon the written [agreement] in ascertaining the intent of the parties, the legal inferences properly to be drawn from the [document is a question] of law . . . . *Morton Buildings, Inc.* v. *Bannon*, supra, 53–54. . . . See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 219 Conn. 51, 62, 591 A.2d 1231 (1991) (legal effect of [undisputed] facts is question of law); *Bria* v. *St. Joseph's Hospital*, 153 Conn. 626, 632, 220 A.2d 29 (1966) (when surrounding circumstances are not in dispute, construction and legal effect of [agreement] is question of law)." (Citation omitted; internal quotation marks omitted.) *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229–30, 654 A.2d 342 (1995). In short, our resolution of the present appeal does not call upon us to go outside the four corners of the agreement, the language of which is clear and unambiguous.[11] Accordingly, our standard of review is plenary.

The plaintiff argues that the defendant should have recalculated the estimate of his 1995 gross earnings by

---

[11] Significantly, the trial court characterized "the language [of the agreement] regarding the payment of alimony [as] clear and unambiguous."

Because it is not necessary to our resolution of the issues before us, we decline to reach the defendant's argument that we should abandon the deferential standard of review that we apply in civil contempt matters that involve questions of fact.

reference to his taxable income for that year, *not* by reference to the accountant's letter that was released in March of 1996. In other words, the plaintiff argues that the defendant did not comply with the agreement by failing to pay alimony on income that he earned in 1994 and received from H. H. Brown several months prior to the date of the dissolution on June 30, 1995. The trial court and the Appellate Court both agreed with the plaintiff. We, however, are not persuaded.

As discussed previously, article 2.5 of the agreement expressly provides that, "[w]hile the [defendant] is employed by [H. H. Brown], the [defendant's] gross earnings will be determined by H. H. Brown's independent certified public accountant's letter which computes the compensation of [the defendant]." The plaintiff ignores this language.[12]

The plaintiff's omission is unavailing for the very simple reason that the agreement provides that the defendant's alimony obligations are calculated by reference to the accountant's letter that the plaintiff wants to ignore. The nuts and bolts of the defendant's alimony

---

[12] The plaintiff relies entirely upon article 2.2 of the agreement. This reliance is misplaced. Article 2.2 contains a general definition of gross earnings: "Gross earnings shall be defined as all income earned by the [defendant], *wherever he may be employed* . . . ." (Emphasis added.) Article 2.2 contains no explanation for how the defendant should calculate his alimony obligations while he is employed by H. H. Brown. This explanation is contained in article 2.5, which sets forth a particular method of calculating gross earnings in the specific context of the defendant's sophisticated compensation arrangement with H. H. Brown: *"While the [defendant] is employed by [H. H. Brown],* the [defendant's] gross earnings will be determined by H. H. Brown's independent certified public accountant's letter . . . ." (Emphasis added.) For generations, it has been well settled that "the particular language of a contract must prevail over the general." *Miller Bros. Construction Co.* v. *Maryland Casualty Co.*, 113 Conn. 504, 514, 155 A. 709 (1931); see E. Farnsworth, Contracts (2d Ed. 1998) § 7.11, p. 285 and cases cited therein ("a specific provision controls a general one and may operate as an exception to it"); 2 Restatement (Second), Contracts § 203 (c) (1981) ("specific terms and exact terms are given greater weight than general language").

obligations first appear in article 2.6 (A). This provision sets forth the parties' estimate of the defendant's 1995 gross earnings, then provides for a recalculation "[w]ithin [five] days of March 31, 1996, *which is when the accountants will have completed the annual H. H. Brown audit and prepared the calculation of [the defendant's] gross earnings . . . .*" (Emphasis added.) This recalculation in April of 1996 occurs as soon as information regarding H. H. Brown's profits for 1995— and, correlatively, the defendant's gross earnings for 1995—becomes available. The recalculation in April of 1996 is obviously designed to ensure that the defendant's alimony payments for the prior year reflect the gross earnings disclosed in the accountant's letter.[13] By its terms, the requirement of subsequent recalculations contained in article 2.6 (B) is likewise designed to ensure that the defendant's alimony payments for "each year commencing [with] 1996" reflect the gross earnings disclosed in the accountant's letter released in March of the following year.

The agreement thus expressly provides that the accountant's letter released in 1996 governs the recalculation of the defendant's alimony obligations on his gross earnings for 1995 and that subsequent accountant's letters will govern the recalculation of his alimony obligations on his gross earnings for "each year commencing [with] 1996." The agreement does *not* state that the defendant must pay alimony on the taxable income that he earned in 1994 and received from H. H. Brown several months prior to the dissolution in 1995. In fact, that income was reflected in an accountant's letter released approximately one year *before* the first

---

[13] If the parties had wanted to calculate the defendant's alimony obligations based upon his taxable income, they would not have timed the annual recalculation of the estimate to coincide with the release of the accountant's letter in March—several months *after* the defendant's taxable income is known.

accountant's letter that is referred to in the agreement. Accordingly, the plaintiff's claim that she is entitled to alimony on this income finds no support in the agreement.

Significantly, the plaintiff's argument before this court contradicts her testimony before the trial court that presided over the dissolution of her marriage. During the colloquy with her own attorney shortly after she executed the agreement, the plaintiff made the following concessions: (1) the accountant's letter is "how [the defendant] knows what he has 'earned' "; (2) she will receive a copy of the accountant's letter every year; (3) she is familiar with the defendant's compensation agreement with H. H. Brown; (4) the defendant's alimony obligations are based on the compensation agreement and, therefore, on the accountant's letter;[14] and (5) the estimate is revised annually based upon the accountant's letter. Our fundamental objective when construing a contract is to ascertain the intent of the parties. See, e.g., *Levine* v. *Massey*, supra, 232 Conn. 277. This colloquy makes the parties' intent clear.

Moreover, one corollary of the plaintiff's argument that the accountant's letter is irrelevant is that much of the agreement is meaningless and superfluous. More specifically, neither the definition of "gross earnings" set forth in article 2.5 nor the nuts and bolts explanation of the defendant's alimony obligations set forth in article 2.6 makes any sense unless the accountant's letter is used to determine the defendant's alimony obligations. The fact that the plaintiff's argument renders much of

[14] As discussed in footnote 2 of this opinion, the defendant's compensation agreement provides that his incentive compensation is based on the profits of H. H. Brown, which are set forth in the annual accountant's letters. Accordingly, the plaintiff's concession that the defendant's alimony obligations are based on his compensation agreement is equivalent to a concession that the defendant's alimony obligations are based on the accountant's letters.

the agreement meaningless supplies a further reason for rejecting her position. See, e.g., *Hatcho Corp.* v. *Della Pietra*, 195 Conn. 18, 23, 485 A.2d 1285 (1985) ("[p]arties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible"); *Barnard* v. *Barnard*, supra, 214 Conn. 116 (same); see also *Levine* v. *Advest, Inc.*, 244 Conn. 732, 753, 714 A.2d 649 (1998) (" 'contract . . . construed so as to give full meaning and effect to all of its provisions' ").

If we were to accept the plaintiff's invitation to rip the thread of the accountant's letter from the fabric of the agreement, the whole agreement would unravel. Aside from the provisions that are expressly based upon the accountant's letter, the agreement does not contain any guidance on how to calculate the defendant's alimony obligations with respect to his complex compensation arrangement with H. H. Brown. We do not believe that the seasoned attorneys who drafted the sophisticated agreement would have failed to set forth a method for determining how to reckon with these funds. The implausibility of this scenario supplies an additional reason to decline the plaintiff's invitation to ignore the accountant's letter.[15]

Another corollary of the plaintiff's argument is that she is asking for a windfall. When the parties entered into a division of their property in the middle of 1995, each party received 50 percent of the total assets. The sum that the plaintiff received included her portion of the incentive compensation that the defendant had

---

[15] The plaintiff claims that "the [trial] court had ample evidence that the [accountant's] letter on which the [d]efendant relied for his computation [of his alimony obligations in 1995] . . . was not the result of the type of 'independent' audit contemplated by the agreement." The trial court did not make such a factual finding, and it is not within our jurisdiction to do so of our own accord. Moreover, the plaintiff has not come forth with any reason to believe that the accountant's letter was inaccurate.

earned in 1994 and that he had received in the beginning of 1995, several months prior to the date of the dissolution. Now, the plaintiff wants to receive alimony upon this money, even though she already has received her share of it as part of the property division. This windfall finds no support in either the terms of the agreement or basic principles of equity.

In short, the defendant's interpretation of the agreement makes sense, and the plaintiff's interpretation does not. Because the defendant's actions comported with the only sensible interpretation of the agreement, the trial court improperly found him in contempt of court.[16]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to vacate the trial court's order of contempt and to remand the case to the trial court to recalculate the defendant's alimony obligation consistent with this opinion.

In this opinion the other justices concurred.

---

[16] In light of this conclusion, we need not reach the remaining issues briefed by the parties.