******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

BRIGHT, J., concurring in part and dissenting in part. Although I agree with the majority's conclusion in part II of its opinion regarding the plaintiff's cross appeal, I disagree with its conclusion in part I of its opinion that the parties' separation agreement (agreement) is clear and unambiguous regarding the terms of the plaintiff's obligation to pay "true up" alimony to the defendant. Because the trial court based its denial of the defendant's motion for contempt solely on its conclusion that the language of the parties' agreement is clear and unambiguous, I conclude that the matter should be remanded to the trial court for factual findings that are required when an agreement is ambiguous. Furthermore, I conclude that the fact that the agreement is ambiguous does not prevent the trial court from granting relief to the defendant, even though it almost certainly would preclude a finding that the plaintiff is in contempt. Finally, because the court made no findings as to whether the plaintiff met his full obligation to pay true up alimony under the terms of the ambiguous agreement, I conclude that we are not in a position to affirm the decision of the trial court on the basis of the plaintiff's alternative ground for affirmance. Consequently, I would reverse the court's judgment denying the defendant's motion for contempt, and I would remand the matter for a new hearing on the motion. Having reached this conclusion, I would affirm the court's judgment denying the plaintiff's motion for attorney's fees. Therefore, I concur in part and respectfully dissent in part.

Because the majority's holding in part I of its opinion rests solely on its conclusion that the agreement is clear and unambiguous, I will focus my analysis on the language of the agreement and the applicable law to explain why I disagree with the majority's conclusion. As a preliminary matter, I agree with the majority's statement as to the applicable law as set forth by our Supreme Court in *Parisi* v. *Parisi*, 315 Conn. 370, 382–84, 107 A.3d 920 (2015). In my view, three principles of contract interpretation are particularly relevant to the resolution of the parties' dispute. First, the parties' agreement must be viewed in its entirety, with each provision read in light of the other provisions, and every provision given effect if possible to do so. *Nation–Bailey* v. *Bailey*, 316 Conn. 182, 191–92, 112 A.3d 144 (2015). Second, if the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. Id. Third, "[w]e will not construe a contract's language in such a way that it would lead to an absurd result." *Welch* v. *Stonybrook Gardens Cooperative, Inc.*, 158 Conn. App. 185, 198, 118 A.3d 675, cert. denied, 318 Conn. 905, 122 A.3d 634 (2015).

In the present case, the parties' dispute revolves around § 1.1 of the agreement, in particular the interplay of that section's initial foundational paragraph and subsection D. Section 1.1 starts by setting forth the parties' agreement regarding the payment of alimony by the plaintiff; specifically, it sets forth the basis for the payment of alimony and a general description of how the amount of alimony due to the defendant is to be calculated. It provides in relevant part: "The alimony payments detailed below are based on . . . the [plaintiff's] *'annual income from employment'* (hereinafter 'income') which, for purposes of the alimony formula herein, is presently defined as Line 1 on [the plaintiff's] annual [schedule] K-1 [form] ([K-1]) from McCormick, Paulding & Huber LLP ('MPH').[1] The alimony paid by the [plaintiff] to the [defendant] shall be paid in three components (monthly payments and quarterly payments totaling $160,000 based on the first $500,000 of [the plaintiff's] income, and a year-end 'true up' alimony payment based on gross income of the [plaintiff] between $550,000 and $750,000). [The defendant] shall not be entitled to any alimony on any annual income of [the plaintiff] in excess of $750,000. Said payments will be made as follows." (Emphasis added; footnote added.)

Section 1.1 then sets forth, in subsections A though D, the timing and methodology for making and calculating the alimony payments. Subsection D, in relevant part, provides: "For the tax year 2014 and thereafter, [the plaintiff] shall pay 'true up' alimony to [the defendant] of 25 [percent] of the amount of [the plaintiff's] income between $550,000 and $750,000 as reflected on Line 1 of [the plaintiff's] K-1 and 20 [percent] of any income between $700,000 and $750,000. For example, if [the plaintiff's] K-1 for 2014 shows Line 1 income of $775,000, [the plaintiff] would owe [the defendant] additional 'true up' alimony in the amount of $47,500 . . . ."

It is undisputed that the plaintiff has paid the defendant the required $160,000 per year in annual alimony. It also is undisputed that the plaintiff paid the defendant the proper amount of true up alimony in 2013 and 2014. Furthermore, had the plaintiff remained a partner at MPH through the end of 2015, and had MPH continued to report all of the plaintiff's employment income on line 1 of his K-1, as it had during the entire twenty plus years he was a partner of MPH, it is unlikely that the parties would have had any dispute over the plaintiff's obligation to pay true up alimony.

In 2015 though, the plaintiff resigned from MPH, effective June 1, and opened a new law firm, Grogan, Tuccillo & Vanderleeden, LLP (GTV), in which he is an equity partner. As a result, the plaintiff received two K-1s in 2015, one from each firm. Furthermore, both firms reported income, or loss, to the plaintiff on both

line 1, titled "ordinary business income," and line 4, titled "guaranteed payments," of the K-1.[2] When the defendant received the required copies of the plaintiff's K-1s, she totaled the amounts on lines 1 and 4 from both K-1s and determined that the plaintiff had a total income from employment in 2015 of $741,732. Applying the formula in § 1.1 D to this amount, the defendant determined that she was entitled to true up alimony in the amount of $45,846. When she demanded payment from the plaintiff, the plaintiff responded that the $605,000 reported on line 4 of the K-1 issued by MPH was not income but, rather, was the return of his capital from the firm upon his departure. The plaintiff informed the defendant that he was challenging MPH's treatment of that payment and asked her not to pursue any claim for true up alimony until he resolved the issue.

The defendant thereafter filed a motion for contempt, the denial of which is the subject of this appeal. In response to the motion for contempt, in addition to disputing that he had received sufficient employment income in 2015 to trigger the requirement that he pay true up alimony, the plaintiff also argued before the trial court that § 1.1 D of the agreement clearly and unambiguously limits income for the purpose of true up alimony to income reported on line 1 of his K-1. Because the total of the amounts reported on line 1 of the plaintiff's two K-1s in 2015 was only $9554, the plaintiff argued that no true up alimony was due.

In contrast, the defendant argued before the trial court, in support of her motion for contempt, that the initial paragraph of § 1.1 clearly and unambiguously requires that alimony payments to the defendant are based on the plaintiff's "annual income from employment." She argued that this includes all income that the plaintiff received as a result of his employment, regardless of the line of the K-1 used to report the income. She further argued that the plaintiff's reliance on the reference in § 1.1 D to line 1 of the K-1 issued by MPH was misplaced because the initial paragraph of § 1.1 makes clear that the parties only intended line 1 of the K-1 issued by MPH to be used because that was how the plaintiff's income from employment, at that time, was "presently defined."

At the hearing on the underlying motion for contempt, the parties' expert witnesses were in conflict as to whether the $605,000 reported on line 4 of the plaintiff's K-1 issued by MPH was income for purposes of the agreement. The defendant's expert witness, Richard Buggy, testified that, on the basis of the amounts recorded on the plaintiff's two K-1s, the plaintiff's total income from employment was $741,732. He also acknowledged though that the payment of the $605,000, as shown on line 4 of the MPH K-1, was related to the plaintiff's sale of his interest in MPH. He also described it as a "departure payment" in exchange for the plaintiff

terminating his partnership interest in MPH. He further testified that one should look at the MPH partnership agreement to see how the payment should be treated, but that he never looked at the agreement. After the plaintiff presented the testimony of his accountant and expert witness, Margaret Mayer, to explain why the $605,000 on line 4 of the MPH K-1 was not income, the defendant recalled Buggy in her rebuttal case to respond to Mayer's analysis. Buggy testified that, even under Mayer's methodology, the plaintiff owed true up alimony of $14,264.

The court decided the defendant's motion for contempt based solely on the language of the agreement, in particular, § 1.1 D. According to the court: "Section 1.1 D of the agreement sets forth the calculation of true up alimony for 2014 and beyond. The defendant's argument that the amounts listed on both lines 1 and line 4 of the K-1s should be considered income requires the court to ignore the language in § 1.1 . . . D. . . . In reaching their agreement, the parties were free to define income in any way they wished. They did not have to use [the] K-1 as a reference. If they wished to do so, they could have referenced lines 1 and 4, line 4, line 1, lines 1, 2, 3, and 4 or any combination of the lines in [the] K-1 . . . . They chose to specify line 1. If [the initial paragraph of] § 1.1 [was] sufficient to define the plaintiff's true up alimony obligation . . . § 1.1 D would be wholly unnecessary and completely superfluous." (Internal quotation marks omitted.) The court's analysis, however, does not discuss the language in the initial paragraph of § 1.1 that the plaintiff's income "for purposes of the alimony formula herein, is presently defined as Line 1 on [the plaintiff's] annual K-1 from . . . MPH." (Internal quotation marks omitted.) Consequently, the court's memorandum of decision does not explain what meaning, if any, the court attached to the clause "presently defined as."

The majority agrees with the court's conclusion. In doing so, the majority similarly ignores the "is presently defined as" language in § 1.1. My colleagues make no attempt to ascribe any meaning to those words or attempt to read them with the language of §1.1 D to give all of the language of § 1.1 meaning. Instead, they offer a variety of reasons, none of which I find persuasive, to essentially read the "is presently defined as" language out of the parties' agreement.[3] I address each of them in turn.

First, the majority, as did the trial court, notes that the parties could have defined income any way they wanted and could have identified lines other than line 1 of the K-1 from which to compute income. The majority then states that it "cannot ignore or disregard the language of the agreement because in hindsight an additional or more expansive term would have been better for one of the parties." The majority's reasoning ignores

the fact that the parties specifically chose to define the plaintiff's income as his "annual income from employment." Section 1.1 D then sets forth that line 1 of the plaintiff's K-1 from MPH was to be used at the time of drafting because that was how the plaintiff's annual income from employment was "presently defined." There was no need to provide a different way to identify the plaintiff's income because the parties could not have anticipated, when the agreement was signed, that the plaintiff's employment would change or whether the manner of reporting his income would change. It is a reasonable reading of the agreement that by defining the plaintiff's obligation to pay alimony broadly as based on his "annual income from employment," the defendant protected herself from any such contingency, while also setting forth precisely how the plaintiff's income was calculated at the time of the dissolution.

Furthermore, the cases relied on by the majority do not support its conclusion. Our Supreme Court in *Crews* v. *Crews*, 295 Conn. 153, 169, 989 A.2d 1060 (2010), addressed the high burden a party faces when challenging the enforceability of a premarital agreement. In doing so, the court set forth the unremarkable proposition that parties are free to contract for whatever terms they choose. In the present case, the parties chose to qualify the reference to the plaintiff's K-1 from MPH by stating that that was how his income was "presently defined."[4] The use of such a qualifier reasonably can be read as expressing an understanding that his income might not always be defined that way, and that a change in circumstances might require that it be defined differently. In fact, had the parties intended otherwise, there would have been no reason to include the "is presently defined as" language in the agreement.

Similarly, *Chang* v. *Chang*, 170 Conn. App. 822, 155 A.3d 1272, cert. denied, 325 Conn. 910, 158 A.3d 321 (2017), also is inapplicable to the present case. In *Chang*, the defendant challenged the court's award of alimony to the plaintiff because the parties' premarital agreement did not provide for the possibility of alimony upon the dissolution of the parties' marriage. This court rejected the defendant's argument because there was "no provision in the agreement that even tangentially govern[ed] the parties' rights to alimony upon the dissolution of the marriage." Id., 830. In the present case, the defendant is not asking that a *new term* be added to the parties' agreement. Rather, she simply is asking that the court interpret the parties' agreement to give meaning to *all* of its terms.

The majority next states that, to the extent that the general language in the first paragraph of § 1.1 conflicts with the specific language in § 1.1 D, the specific language in § 1.1 D must govern. I disagree with the majority's reasoning for three reasons.

First, the principle relied on by the majority applies

when reliance on the general language of the agreement would render the specific language meaningless. For example, in *Issler* v. *Issler*, 250 Conn. 226, 737 A.2d 383 (1999), another case on which the majority relies, the parties disputed the manner in which the defendant's alimony obligation should be determined. Id., 234. The parties' separation agreement explicitly provided that an accountant would prepare a letter setting forth the defendant's income from his employer, H. H. Brown. Id., 231. The plaintiff argued that the letter was insufficient because it did not capture all of the defendant's income from H. H. Brown, and the parties' agreement provided that the defendant was to pay alimony based upon his "gross earnings" from H. H. Brown. Id., 234, 236–37. The court rejected the plaintiff's argument because it would render meaningless the language in the agreement relating to the accountant's letter. Id., 239. Instead, the court held that the agreement should be construed to give full meaning and effect to all of its provisions. Id., 240. In the present case, the majority's reasoning violates this rule by rendering entirely meaningless the "is presently defined as" language at issue here.

The trial court did apply this rule, but reached what I believe to be the erroneous conclusion that the defendant's interpretation renders § 1.1 D "wholly unnecessary and completely superfluous." The initial paragraph of § 1.1 does not set forth the formula for calculating true up alimony. It merely states that the plaintiff must pay true up alimony on income, which the agreement defines as annual income from employment, between $550,000 and $750,000. Section 1.1 D provides the specific percentages that are to be applied to income between $550,000 and $700,000 and between $700,000 and $750,000. It also sets forth when such payments must be made and that the defendant is entitled to a copy of the plaintiff's K-1. Consequently, under the defendant's interpretation, § 1.1 D is far from superfluous; rather, it absolutely is necessary to the determination of the plaintiff's obligation.

I acknowledge that § 1.1 D provides that the income used to calculate true up alimony is that "reflected on line 1 of [the plaintiff's] K-1." That language, as the majority concedes, must be interpreted in conjunction with the language in the initial foundational paragraph of § 1.1, which the trial court failed to do. Reading § 1.1 in its entirety, I conclude that the defendant has offered a reasonable interpretation of the agreement.

Second, "[w]here two clauses which are apparently inconsistent *may be reconciled by a reasonable construction*, that construction must be given, because it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions." (Emphasis in original; internal quotation marks omitted.) *Thoma* v. *Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 61, 100 A.3d 917 (2014). As noted previously, the

defendant has offered a construction that reconciles the foundational paragraph of § 1.1 with § 1.1 D.

Finally, "[i]rreconcilable inconsistent provisions have been treated by this court and our Supreme Court as creating an ambiguity within the contract." Id., 60. Thus, to the extent that there is an irreconcilable conflict between the foundational paragraph of § 1.1 and § 1.1 D, the court should have considered extrinsic evidence to determine the intent of the parties in light of the conflict.

The majority also posits that the defendant has abandoned her claim that the agreement is ambiguous because she failed to brief this issue adequately. I disagree. In her principal brief, the defendant argues why the language of the agreement does not clearly and unambiguously lead to the result advocated by the plaintiff and argues what the court should have done if it did not accept the defendant's argument regarding the clear and unambiguous meaning of the agreement. The plaintiff clearly understood the defendant's argument and addressed it in his brief on appeal. In addition, most of the defendant's reply brief is devoted to this issue. I conclude that the issue has been briefed fully and sufficiently. Furthermore, because the question of whether the agreement is ambiguous is a legal one, and is a "threshold question," it properly is before us regardless of how it was briefed. *Parisi* v. *Parisi*, supra, 315 Conn. 380. It is our duty in considering a judgment on a motion for contempt to determine first whether the agreement was ambiguous even if both parties offered what they claimed were competing clear and unambiguous interpretations. Id.; *In re Leah S.*, 284 Conn. 685, 693, 935 A.2d 1021 (2007). In fact, in *Parisi*, neither party argued at the trial court *or on appeal* that the agreement was ambiguous. *Parisi* v. *Parisi*, supra, 378–79. Nevertheless, our Supreme Court addressed the "threshold question" of whether the parties' separation agreement was clear and unambiguous. Id., 380–81. It held that, the arguments of the parties notwithstanding, "each of the parties has set forth a plausible construction of the alimony buyout provision, with both constructions having bases in the language used in the separation agreement. We conclude, therefore, that the agreement . . . is ambiguous, with its meaning presenting a question of fact that the trial court should have fully considered and resolved." Id., 385. That is precisely the situation in the present case. Both parties have presented plausible arguments based on the language of the parties' agreement. In my opinion, the agreement, therefore, is ambiguous. See id.

The majority's interpretation of § 1.1 also is problematic because it leads to absurd results. Under the majority's analysis, if the plaintiff's employment income is reported in some manner other than on line 1 of a K-1, the defendant would be entitled to no true up alimony.

This would be true even though neither party disputes that the line on which income is reported on a K-1 is largely in the discretion of the preparer. It also would be true if the plaintiff's law firm changed its organizational structure from a partnership reporting income on a K-1 to a professional corporation that would report its members' incomes on W-2 forms. Similarly, under the majority's interpretation, the defendant would be entitled to no true up alimony if the plaintiff, instead of working in a law firm, practiced law as the general counsel of a major corporation, and his income was reported on a W-2 form or a 1099 form. I cannot square such outcomes with the parties' express statement in their agreement that the plaintiff's obligation to pay alimony is based on his "annual income from employment."

The majority ignores such absurdities by stating that because the plaintiff did not receive a W-2 form for 2015, it is "inappropriate to speculate about the possible effect, if any, on the application of the agreement of his receipt of such other income reporting forms." No speculation is necessary though. The majority's holding spells out very clearly what would happen if the plaintiff's income is reported in some manner other than on line 1 of a K-1. The defendant would be entitled to no true up alimony. This is the undeniable consequence of the majority's interpretation and in no way is speculative.

In sum, I conclude that the plaintiff has offered a reasonable, if not more reasonable, interpretation of the agreement. The foundational paragraph of § 1.1 explicitly provides that alimony payments are to be made on the basis of the plaintiff's annual income from employment. At the time the agreement was executed, that income was "presently defined as" what was shown on line 1 of the plaintiff's K-1 from MPH. The reference to "presently defined" reasonably can be read as temporal, meaning that the plaintiff's income is currently reflected on his MPH K-1, but that it could be reflected in some other manner in the future.[5] Such an interpretation works hand in hand with the formula in § 1.1 D, while still preserving the parties' clearly stated intention to base the plaintiff's obligation to pay alimony on his employment income if his employment, or the manner in which his income is reported, changed from the state that existed when the parties signed the agreement.

Although I have identified what I perceive to be significant problems with the interpretive approach of the trial court and the majority, I am not prepared to dismiss their interpretation as wholly unreasonable; instead, I would conclude that because the agreement is subject to more than one reasonable interpretation, it is ambiguous. See *Parisi* v. *Parisi*, supra, 315 Conn. 385. As such, the trial court should have considered the extrinsic evidence submitted to it to determine how the ambigu-

ities in § 1.1 should be resolved. See id. In fact, the plaintiff specifically offered, through his testimony, extrinsic evidence as to the parties' negotiations and why § 1.1 was drafted in the way it was drafted. In particular, the plaintiff testified that the language of § 1.1 was intended to record properly "any income I, actually, received from the practice of law."[6] He also testified that on which line GTV reported his income on the K-1 would not impact his obligation to pay true up alimony. Unfortunately, the trial court, by finding the agreement to be clear and unambiguous, did not consider such extrinsic evidence. I conclude that this was an error that requires a new hearing.

Having reached this conclusion, I turn to the plaintiff's alternative arguments for affirmance. First, the plaintiff argues that if the agreement is ambiguous, he cannot be held in contempt because a finding of contempt must be made on the basis of the intentional violation of a clear and unambiguous court order. *Brody* v. *Brody*, 315 Conn. 300, 319, 105 A.3d 887 (2015). I agree that my conclusion that the agreement is ambiguous would preclude a finding that the plaintiff is in contempt of court because he disputed the defendant's claim to true up alimony. Nevertheless, the trial court still can order relief in the form of true up alimony payments if it concludes, on the basis of the language of the agreement interpreted in light of relevant extrinsic evidence, that the defendant's interpretation of the agreement is correct and that the plaintiff has under calculated his income for 2015. See *O'Brien* v. *O'Brien*, 326 Conn. 81, 99, 161 A.3d 1236 (2017) ("[i]n a contempt proceeding, even in the absence of a finding of contempt, a trial court has broad discretion to make whole any party who has suffered as a result of another party's failure to comply with a court order" [internal quotation marks omitted]); *Parisi* v. *Parisi*, supra, 315 Conn. 381 ("court's inherent authority to effectuate its prior judgments, either by summarily ordering compliance with a clear judgment or by interpreting an ambiguous judgment and entering orders to effectuate the judgment as interpreted, is not dependent upon a predicate finding that a noncompliant party is in contempt" [internal quotation marks omitted]); *Pressley* v. *Johnson*, 173 Conn. App. 402, 408–409, 162 A.3d 751 (2017) (although not finding defendant in contempt, trial court had authority "to fashion an order consistent with protecting the integrity of the dissolution judgment").

Second, the plaintiff argues that the $605,000 payment he received from MPH when he left the firm clearly was not income, but was instead the purchase of his ownership interest in the firm. Although I agree that the plaintiff submitted a significant amount of evidence to support his position, it is not the function of this court to find facts. See *Parisi* v. *Parisi*, supra, 315 Conn 385 ("[i]t is elementary that neither [our Supreme Court] nor the Appellate Court can find facts in the first

instance . . . but may only *review* such findings to see whether they might be legally, logically and reasonably found" [emphasis in original; internal quotation marks omitted]). Because the trial court did not resolve this question, there are no findings for this court to review. Consequently, I would reverse the trial court's judgment denying the defendant's motion for contempt and remand the case to the trial court for a new hearing on the motion.

Having concluded that the agreement is ambiguous and that a further hearing is required on the defendant's motion, I agree with the majority's conclusion in part II of its opinion that the court did not err in denying the plaintiff's request for attorney's fees. Consequently, I respectfully dissent only from part I of the opinion.

[1] At the time the parties entered into the agreement and the dissolution judgment was rendered, the plaintiff was a full equity partner and the managing partner of MPH.

[2] The majority notes that the court found that the plaintiff had no control over how his income was reported on his 2015 schedule K-1. The majority's reliance on this factual finding is troubling for two reasons. First, the finding is based on evidence extrinsic to the parties' contract, in particular, the plaintiff's testimony. Of course, such extrinsic evidence only may be considered where the agreement at issue is ambiguous. Second, the plaintiff did not testify that he had no control over GTV's K-1. To the contrary, he testified that it was a mistake for his new accountant to record any income on line 4 of the K-1, and that for 2016, all income from GTV was reported on line 1 of the K-1.

[3] Although not stated as a reason to conclude that the agreement is clear and unambiguous, the majority takes the time to note that both parties are attorneys, who also were represented by counsel when they entered into the agreement. To the extent that the majority sets forth these facts for the purpose of lending support for its conclusion, I am not persuaded. First, the parties' professions and whether they were represented by counsel are extrinsic facts that can be considered only if the agreement is not clear and unambiguous. Second, it is not unusual for sophisticated parties who are represented by highly skilled and experienced attorneys to enter into ambiguous agreements. See, e.g., *Gold* v. *Rowland*, 325 Conn. 146, 171–89, 156 A.3d 477 (2017).

[4] Yet another reason that the language of § 1.1 is not clear and unambiguous is that it refers to "line 1 of [the plaintiff's] K-1" from MPH. It does not mention the possibility of multiple K-1s from different firms. Despite this, the plaintiff, the trial court, and the majority, without comment, simply ignore the reference to a single K-1 from MPH and assume that true up alimony is to be calculated from line 1 of all of the K-1s issued to the plaintiff.

[5] The majority states that the defendant has provided no analysis nor cited to any legal authority to support her contention that the addition of the word "presently" somehow transforms the definition of "income" provided by § 1.1 into a mere example. I disagree. The defendant carefully analyzed § 1.1, including pointing out that the trial court's interpretation rendered the "presently defined" language superfluous. I also disagree that the defendant needed to cite legal authority as to how the word "presently" modified the definition of true up alimony. The defendant properly relied on the common meaning of "presently," which the majority defines as "now" or "at the present time." That definition is completely consistent with the defendant's argument and my analysis.

[6] The defendant objected to the admission of any evidence regarding the parties' negotiation of the agreement claiming that parol evidence is not admissible where an agreement is clear and unambiguous. In response, plaintiff's counsel argued that because the evidence was not offered to vary or alter the terms of the agreement, which he also claimed was clear and unambiguous, the evidence did not "run afoul of the parol evidence rule." The court overruled the defendant's objection and admitted the evidence. The argument of plaintiff's counsel and the ruling of the court reflect a misunderstanding of the parol evidence rule. The law is clear that parol evidence is not admissible where the agreement is clear and unambiguous.

*HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 357–58, 727 A.2d 1260 (1999). Only if the agreement is ambiguous may parol evidence be admitted, and then only if such evidence does "not vary or contradict the terms of the contract." Id., 359–60.

———————————————————