# HLO LAND OWNERSHIP ASSOCIATES LIMITED PARTNERSHIP *v.* CITY OF HARTFORD
## (SC 15896)

Callahan, C. J., and Borden, Berdon, Norcott and McDonald, Js.

Argued November 5, 1998—officially released April 6, 1999

*Wesley W. Horton*, with whom were *Arnold Sbarge* and *Allison A. Wood*, legal intern, for the appellant (plaintiff).

*Michael C. Collins*, deputy corporation counsel, with whom, on the brief, was *Kevin G. Dubay*, corporation counsel, for the appellee (defendant).

*Opinion*

BORDEN, J. The plaintiff, HLO Land Ownership Associates Limited Partnership, appeals[1] from the judgment of the trial court dismissing its tax appeal regarding the valuation of its property by the defendant, the city of Hartford, on the grand lists of October 1, 1995, and October 1, 1996. The plaintiff claims that the trial court improperly: (1) excluded parol evidence regarding a certain prior stipulated judgment between the parties; and (2) interpreted that stipulated judgment. We affirm the judgment of the trial court.

The plaintiff brought this action against the defendant pursuant to General Statutes § 12-117a,[2] claiming that

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] General Statutes § 12-117a provides: "Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall

the valuation of its property for tax purposes in 1995 and 1996 was "grossly excessive, disproportionate and illegal . . . ."[3] The defendant filed a special defense asserting that "[t]he complaint is barred by the doctrines of res judicata and collateral estoppel. The issue

be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

The plaintiff first had appealed to the board of assessment appeals of the defendant, which denied the plaintiff's appeal.

[3] In its original complaint, the plaintiff challenged only the 1995 assessment. Thereafter, the plaintiff amended its complaint to include a challenge to the 1996 assessment.

sought to be put before the court was previously decided in the tax appeal case captioned [*HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV 90-0379794-S (March 31, 1993)]." The trial court, in effect, sustained this special defense and rendered judgment for the defendant. This appeal followed.

The following facts are not in dispute. On October 1, 1989, the defendant valued the subject property as four separate parcels of land: 10-52 Ford Street, $21,148,000; 355 Asylum Street, $6,614,600; 377 Asylum Street, $1,003,900; and 361 Asylum Street, $623,800, for a total valuation of $29,390,300. As of that date, the plaintiff was operating a Hilton Hotel on the property. On December 31, 1989, however, the plaintiff chose to cease operations of the hotel, and on October 28, 1990, at the direction of the plaintiff, the hotel building was imploded. Since August 1, 1992, the vacant land has been used as a surface parking lot.

The plaintiff appealed to the defendant's board of tax review seeking a reduction in the October 1, 1989 valuation. The board refused to lower the valuation, and on June 22, 1990, the plaintiff appealed from the board's decision to the Superior Court. On March 31, 1993, the parties filed a motion for a stipulated judgment, and judgment was rendered accordingly.

In the stipulated judgment, the parties agreed that "[t]he true and actual value of [the] plaintiff's properties on the assessment date of October 1, 1989 shall be reduced, in the aggregate, to $17,395,200, allocated as follows: 10-52 Ford Street, $9,872,640; 355 Asylum Street, $5,969,280; 377 Asylum Street, $958,080; 361 Asylum Street, $595,200."[4] According to the provision specifically at issue in this appeal, these values were to

---

[4] The parties also agreed that the subject property was to be recognized as a single parcel of vacant land known as 10-52 Ford Street.

be effective "commencing with October 1, 1990, and continuing up to but not including the assessment date on which the next city-wide revaluation of real property takes effect, *which the parties expect to occur effective with the grand list of October 1, 1994* . . . ." (Emphasis added.)

At the time the parties entered into the stipulation, General Statutes (Rev. to 1993) § 12-62 (f) required the defendant to conduct a revaluation every five years.[5] In June, 1994, however, the General Assembly enacted Public Acts, Spec. Sess., May, 1994, No. 94-4, § 51, codified as General Statutes (Rev. to 1995) § 12-62h, which permitted municipalities who were scheduled to conduct a revaluation in 1994 to postpone their revaluation until 1996.[6] In early 1995, the General Assembly amended that statute by enacting Public Acts 1995, No. 95-283, § 8, which permitted municipalities to postpone revaluation for a period not to exceed three years.[7] As a result of these acts, the defendant did not conduct a

[5] General Statutes (Rev. to 1993) § 12-62 (f) provided in pertinent part: "[T]he assessors of all towns . . . which have implemented a program of property tax surcharges and credits in accordance with subsections (e) to (k), inclusive, of section 12-62d, shall no later than five years following the effective date of the last preceding revaluation of all real property and every five years thereafter, revalue all of the real estate in their respective municipalities for assessment purposes . . . ." This statute applied to revaluation by the defendant, which had implemented a program of property tax surcharges and credits beginning with the October 1, 1989 grand list.

[6] Public Acts, Spec. Sess., May, 1994, No. 94-4, § 51, provided in pertinent part: "[T]he local legislative body of a municipality may, at its option, stay the implementation of such municipality's revaluation in order to implement the recommendations of the Property Tax Reform Commission enacted during the 1995 session of the general assembly . . . for a period or periods not to exceed in the aggregate two years . . . ."

[7] Public Acts 1995, No. 95-283, § 8, provided in pertinent part: "[T]he local legislative body of a municipality may, at its option, stay the implementation of such municipality's revaluation in order to implement the recommendations of the Property Tax Reform Commission . . . . The local legislative body of a municipality may stay such implementation for a period or periods not to exceed in the aggregate [two] THREE years. . . ."

citywide revaluation on October 1, 1994, and is now required to conduct its next revaluation on October 1, 1999.

The plaintiff first claims that the trial court improperly excluded parol evidence it had offered to explain the phrase, "which the parties expect to occur effective with the grand list of October 1, 1994," in the stipulated judgment of March 31, 1993. The plaintiff claimed that the phrase is ambiguous and, therefore, parol evidence was admissible to explain its meaning. Although we agree with the plaintiff that the phrase is ambiguous enough to surmount that initial impediment to the rule against the admission of parol evidence, we conclude that the trial court's ruling was correct nonetheless because the proffered evidence would have exceeded the proper scope of parol evidence. We therefore affirm the trial court's ruling on grounds different from that on which that court had relied.

The plaintiff offered the parol testimony of Richard Steele, who was employed as a senior vice president of administration for DT Chase Enterprises, Inc.,[8] at the time that the stipulated judgment had been entered into, to explain what the plaintiff intended by its use of the phrase in the stipulated judgment. The trial court ultimately excluded the evidence, ruling that the phrase was not ambiguous.[9]

---

[8] DT Chase Enterprises, Inc., was the company that managed the property of the plaintiff.

[9] During the plaintiff's case-in-chief, it asked Steele to describe the importance of the language relating to the expectation of an October 1, 1994 valuation. The defendant objected, arguing that the document was self-explanatory. The trial court allowed the testimony, subject to the court's later determination regarding the ambiguity of the contract language. The court stated: "After reviewing the testimony, if the court determines that there is no ambiguity then the court will disregard the parol evidence." In its memorandum of decision, the court determined that the contract language was not ambiguous and that, therefore, the parol evidence was inadmissible. The court, therefore, disregarded the parol evidence. This procedure employed by the trial court was improper.

Our analysis is guided by the well established principle that "[a] judgment rendered in accordance with . . . a stipulation of the parties is to be regarded and construed as a contract. *Barnard* v. *Barnard*, 214 Conn. 99, 109, 570 A.2d 690 (1990). Thus, our resolution of the plaintiff's claim is guided by the principles that govern the construction of contracts." (Internal quotation marks omitted.) *Tremaine* v. *Tremaine*, 235 Conn. 45, 56–57, 663 A.2d 387 (1995).

"A contract is to be construed as a whole and all relevant provisions will be considered together. . . . In giving meaning to the terms of a contract, we have said that a contract must be construed to effectuate the intent of the contracting parties. . . . The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation

General Statutes § 52-208 provides in relevant part: "Whenever evidence offered upon the trial of any civil action is objected to as inadmissible, the court or committee trying such action shall not admit such evidence subject to the objection, unless both parties agree that it be so admitted . . . ." The appropriate procedure, therefore, would have been for the plaintiff to make an offer of proof regarding Steele's testimony, and for the trial court to have ruled on its admissibility. The plaintiff, however, was not harmed by this unorthodox procedure, as it acknowledged in oral argument before this court.

In answer to the question, Steele responded: "The date of revaluation was crucial to the financial aspects of the settlement, in essence we felt we were stipulating or agreeing to a very high value on the property; we felt it was considerably more than the property was worth at the present time; we felt the future development prospects were bleak at best, and the only way we could generate any income was as a parking lot.

"With that as a background, with that as an assumption, which I think has been borne out, why would we agree to a very high value if we expected that value to be relevant for a long period of time? The only reason we agreed to that high value was based on the understanding that that value would only be applicable until the next revaluation date of October 1994, and by agreeing with the [defendant] and not fighting with the [defendant], we would save ourselves the time and trouble of litigation and the costs, and so on and so forth. So the actual date of revaluation was crucial to us, since in our minds we were agreeing to an extremely high value for the property."

of the parties and the circumstances connected with the transaction. . . . In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . [*Barnard* v. *Barnard,* supra, 214 Conn. 109–10]. Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . *Levine* v. *Massey,* 232 Conn. 272, 279, 654 A.2d 737 (1995). Absent a statutory warranty or definitive contract language, the trial court's interpretation of a contract, being a determination of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous. *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 199, 520 A.2d 208 (1987)." (Internal quotation marks omitted.) *Tremaine* v. *Tremaine,* supra, 235 Conn. 57.

Moreover, "[a]s we have so often noted, the parol evidence rule is not a rule of evidence, but a substantive rule of contract law. *Security Equities* v. *Giamba,* 210 Conn. 71, 77–78, 553 A.2d 1135 (1989); *Damora* v. *Christ-Janer,* 184 Conn. 109, 113, 441 A.2d 61 (1981); *Cohn* v. *Dunn,* 111 Conn. 342, 346, 149 A. 851 (1930); see also 2 Restatement (Second), Contracts § 213, comment (a) [1981]; 3 A. Corbin, [Contracts (1960)] § 573; 4 S. Williston, [Contracts (3d Ed. 1961)] § 631. The rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement,

it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. *Glendale Woolen Co.* v. *The Protection Ins. Co.*, 21 Conn. 19, 37 (1851)." (Internal quotation marks omitted.) *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 779–80, 653 A.2d 122 (1995).

"The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. *Jay Realty, Inc.* v. *Ahearn Development Corporation*, 189 Conn. 52, 56, 453 A.2d 771 (1983). These recognized exceptions are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or

fraud. *Noble* v. *Comstock*, 3 Conn. 295, 299 (1820); see also *Dale* v. *Gear*, 38 Conn. 15, 18–19 (1871) (agency, trust, equitable relation or equity may be shown by parol evidence). *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288–89, 589 A.2d 329 (1991)." (Internal quotation marks omitted.) *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 780–81.

The plaintiff has not disputed, either in this court or in the trial court, that this stipulated agreement was the type of contract to which the parol evidence rule applies, namely, a contract that purports to embody the entire agreement of the parties. See *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 273, 439 A.2d 314 (1981) (parol evidence rule applies to integrated agreement). Nor does the plaintiff argue before this court that the contract should be rescinded because it was based upon mutual mistake.[10] The proffered testimony should have been admitted, therefore, only if the

[10] In pretrial oral argument before the trial court, the plaintiff's position was that the expectation of valuation on October 1, 1994, was a condition of the agreement between the plaintiff and the defendant, and that "had that not been a condition of the agreement there would have been no agreement." The plaintiff also argued that "since both parties indicated that the next [revaluation] they expected would be as of October 1, 1994, and since that did not happen, that there was a mutual mistake." The plaintiff, however, did not make these arguments in its posttrial brief to the trial court, and specifically has not renewed this argument on appeal. Moreover, in argument before this court, the plaintiff expressly disclaimed any assertion that the subject stipulation should be rescinded based upon the existence of a mutual mistake. We do not consider, therefore, whether the facts of this case would warrant a rescission of the contract between the plaintiff and the defendant.

We note, however, that the factual predicate necessary for a trial court's finding of mutual mistake, and the practical ramifications of such a finding, are very different from the issues presented in this appeal. The factual predicate is that the plaintiff would have to prove that *both* parties bargained based upon the same mistaken understanding. *Buol Machine Co.* v. *Buckens*, 146 Conn. 639, 641, 153 A.2d 826 (1959) ("[r]escission of a contract on the ground of mutual mistake may be granted in a proper case where the mistake is common to both parties and by reason of it each has done what neither intended"). The practical ramifications are that the plaintiff would be

contract language was ambiguous *and* the testimony would not vary or contradict the terms of the contract.

We agree with the plaintiff that the phrase "which the parties expect to occur," is ambiguous. Precisely what effect, if any, the parties intended it to have, cannot be gleaned definitively solely from the contractual language. The parol evidence offered, however, would have gone beyond explaining the meaning of the phrase at issue. It would have tended to show, instead, that the contract should be rescinded because it was entered into on the basis of a mistake. The plaintiff expressly argues that had the court "considered the plaintiff's proffered evidence . . . the trial court would likely have found persuasive the uncontroverted testimony that a revaluation in 1994 was crucial to the plaintiff's willingness to settle . . . ." In other words, the only reasonable inference that can be drawn from Steele's testimony is that if the revaluation were not to occur on the date that the parties expected, the plaintiff would not have entered into the stipulation. This does not constitute the explanation of an ambiguous phrase. It is, instead, part of the necessary proof of a claim of mutual mistake leading to rescission of the contract, namely, that the plaintiff was under the mistaken impression that a revaluation would necessarily take place in 1994, and on the basis of that mistake, it entered into the stipulation. The plaintiff, however, specifically has disavowed in this court any claim of rescission on the basis of mutual mistake. See footnote 10 of this opinion. Thus, the parol evidence was not admissible because it would have varied or contradicted the contract. *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 780.

---

required to go back to square one and litigate the first tax appeal, thus forgoing those benefits it did gain from the settlement, and taking the risk that its legal theory in that appeal—that a taxpayer can gain an interim reduction in its assessment by voluntarily destroying its building—might not prevail.

The plaintiff's alternate claim is that, even if the contract language is clear and unambiguous on its face, the language has only one meaning as a matter of law, namely, that the defendant was obligated to employ its "best efforts" to bring about a 1994 revaluation. We already have determined, however, that the language is ambiguous. Moreover, our thorough examination of the complaint, the trial court briefs, the transcript of the argument before the trial court, and the trial court's memorandum of decision, provides no indication that this claim was presented to the trial court. Practice Book § 60-5 provides in pertinent part that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court." We have held, moreover, that "[w]here a trial court's action does not result in any manifest injustice, a defendant's claim under the plain error doctrine does not warrant review. . . . Such review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Domian*, 235 Conn. 679, 692, 668 A.2d 1333 (1996). The plaintiff has not asserted, nor engaged in any analysis, to support a reversal of the trial court judgment on the basis of plain error,[11] and we do not perceive any such basis. Furthermore, we ordinarily decide appeals on the basis on which they were litigated in the trial court. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 33–34, 717 A.2d

[11] We note that even if we were to address this claim, we would not be inclined to reverse the judgment of the trial court on the basis of plain error. There is no basis in the language of the stipulated judgment to infer an obligation on the part of the defendant to make its best efforts to revalue all of the property in the city.

77 (1998). We see no reason to depart from these principles in the present case.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and NORCOTT, Js., concurred.

MCDONALD, J., with whom BERDON, J., joins, dissenting. I do not agree that the city of Hartford may interpose the 1993 agreement to bar the plaintiff, HLO Land Ownership Associates Limited Partnership (taxpayer), from seeking review of its 1994 tax assessment. The plain language of the 1993 agreement reveals that the taxpayer expected the next revaluation to take place in October, 1994, and that the agreed upon valuation would be subject to change after that date. It is inescapable that Hartford knew that the taxpayer entered into the agreement with the expectation that there would be a revaluation in 1994. It also is clear that Hartford stated that it, too, expected that there would be a revaluation in 1994. There is no dispute that Hartford, when given the discretion not to conduct a revaluation in 1994, did not conduct that revaluation. Hartford then used the 1993 agreement to block the taxpayer's request for a revaluation in 1994.

In effect, the majority excises from the contract the expectation of both parties that there would be a revaluation in 1994 and allows Hartford—at the taxpayers' expense—to no longer "expect" the 1994 revaluation by simply opting not to conduct such a revaluation. To expect means "to consider . . . certain." Webster's Third New International Dictionary. Because it had the power to do something and decided not to do it, Hartford did not treat the revaluation as "certain." Unless the language of the contract is entirely illusory, it required, at a minimum, that Hartford not take, at its sole option, affirmative action to avoid the 1994 revaluation. That is, Hartford had a duty to act in good faith.

"The tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears the parties intended a contract. . . . An implied obligation to use good faith is enough to avoid the finding of an illusory promise." 2 A. Corbin, Contracts (Rev. Ed. 1995) § 5.28, pp. 149–50. Since it did not keep its promise, which, in the words of Justice Benjamin Cardozo, was "fairly to be implied"; *Wood* v. *Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917); Hartford breached the contract. Because Hartford breached the contract in October, 1994, it should not be rewarded with a windfall consisting of an extension under that contract. Under the circumstances of this case, the taxpayer is entitled to appeal the assessment.

The hallmark of government in this country and this state should be that it acts fairly in its dealings with those subject to its actions, even taxpayers.[1] In this case, Hartford failed to keep its word to the taxpayer and successfully sought to take advantage of that failure. By rewarding Hartford for conduct "against common right and reason"; *Dr. Bonham's Case*, 77 Eng. Rep. 646, 652 (1610); the majority does not do justice. The law has that duty first of all, as Lord Edward Coke taught in *Dr. Bonham's Case.*

The majority sustains Hartford's position because the taxpayer did not make this argument before the trial court. I would hold that the interests of justice require us to recognize the manifest unfairness of Hartford's conduct and of the result in the trial court. See *Seale* v. *Domian*, 235 Conn. 679, 692, 668 A.2d 1333 (1996).

Accordingly, I respectfully dissent.

---

[1] This is, however, the second time within the past year that a majority of this court has endorsed placing an unfair burden on taxpayers by allowing a municipality to postpone its supposedly decennial revaluation of property taxes. See *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 584, 715 A.2d 46 (1998); see also id. (*Berdon, J.,* dissenting). These cases are a portent of the ever worsening treatment of this state's taxpayers.