[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The issue in this case is whether the plaintiff, Andersen Consulting, LLP ("Andersen"), provided services to its customers, Connecticut Natural Gas ("CNG") and Northeast Utilities ("NU"), which would be subject to a sales and use tax pursuant to Connecticut General Statutes § 12-407(2)(i)(A)[1], or whether Andersen sold its customers computer software, which is an intangible and not subject to Connecticut sales and use taxes. In deciding this issue, both Andersen and the defendant Commissioner of Revenue Services ("commissioner") agree that the test to use is to determine the true object of the contract between the parties. See Hartford Parkview Associates LimitedPartnership v. Groppo, 211 Conn. 246, 558 A.2d 993 (1989). Andersen claims that the true object of CNG and NU was to obtain intangible rights to custom computer software. The commissioner claims that the true object of CNG and NU was to obtain the services of Andersen, which is a tangible and taxable right.
Andersen is an Illinois limited liability partnership, with an office in Connecticut. Andersen has extensive experience in developing information computer programs for utility companies.
CNG is a Connecticut public utility providing for local gas distribution to approximately 140,000 customers in the greater Hartford area and in the town of Greenwich. In 1991, CNG decided to acquire new computer information systems to manage its financial, accounting and cost control functions. CNG had developed an information system in 1972 which was performed manually. This system was old and outdated. CT Page 1620
CNG decided that it needed two systems to update its informational systems. The first was a Customer Information System ("CIS"), which would manage billing, accounts receivable, customer service, credit and collection, marketing, and the dispatching of customer service personnel. The second system was a Distribution and Construction Information System ("DCIS"), which would manage planning, cost estimating and cost analysis relating to the installation of gas mains in the streets served by CNG. CNG's main purpose was to obtain computer software systems that would meet the business requirements of the company. CNG had assembled a team to search for a computer software system which would meet its needs. The team considered "off-the-shelf" software such as Microsoft Quicken, which would not only do the job, but would be inexpensive as well. The team found that the "off-the-shelf" software could not be modified by the user and would become very expensive to try to tie into an existing system. The team decided that it needed a customized information system to do the job. CNG solicited requests for proposals from Andersen, International Business Machine and Price Waterhouse. After reviewing the proposals, CNG selected Andersen to develop the CIS and the DCIS systems. In developing the CIS system, Andersen used its "Customer 1" software and modified it to meet CNG's requirements. About 60% of CNG's requirements could be met through the use of the Customer 1 software in developing the CIS system. The remaining 40% was custom developed by Andersen. The custom work included the development of a meter inventory system, creation of a marketing system to keep track of marketing and sales efforts and target prospective customers, and the development of a means to integrate existing computer-aided dispatching system with CIS. In developing the DCIS system for CNG, Andersen used its core package of software known as "Work 1." Work 1 met about 85% of CNG's requirements for DCIS, with the remaining 15% custom developed by Andersen. The 15% custom work was the development of a system that would automatically schedule maintenance for equipment used in the field, and a means to integrate DCIS with CIS. Andersen and CNG entered into two contracts, one for the CIS system and one for the DCIS system. Both contracts were fixed fee contracts with the fees contingent on the delivery by Andersen of a fully functioning software system in accordance with the agreed upon specifications. Although the product resulting from the development of the CIS and DCIS systems remained the property of Andersen after the fulfillment of the contracts, CNG received a perpetual, nonexclusive license to use and modify the software. CT Page 1621
Andersen's fees under the CNG contracts were $12,979,000. Andersen collected a sales and use tax from CNG with respect to the two contracts and remitted the payments to the commissioner. Andersen contends, however, that the sales and use taxes paid on $7,483,704 of the contract amounts were in fact for the nontaxable license and/or sale of intangible rights to custom computer software, and should be refunded to CNG. Andersen claims that it is entitled to a refund under the two CNG contracts of $449,022.
In 1988, NU had no unified system for accounting, budgeting, and work management functions. NU had eleven informational systems in operation. The existing systems were inadequate to serve the needs of NU. NU had explored the use of "off-the-shelf" software. Software for payroll functions were widely available. Some custom software was developed in house where commercial software was nonexistent. NU wanted to develop an integrated system. NU established a task force to conduct a feasibility study to evaluate NU's systems and make recommendations for improvement. The goal of the task force was to develop a system which would permit NU to monitor and budget for costs on a detailed level so that costs could be controlled more effectively. The task force recommended that existing systems be replaced with a Management Information and Budgeting System ("MIB"). The task force explored the use of "off-the-shelf" software, but found that the NU's needs could only be satisfied with the use of custom software because the commercial software met only 20% to 25% of NU's needs. Andersen and NU used a team approach to create the software for the MIB system. Under the contract between NU and Andersen to provide the MIB system, NU provided the space and 50% of the staffing for the project. Andersen provided consulting services for architecture and engineering in the development and construction of the software. The MIB system began with a core package of commercial software known as the Dunn Bradstreet (McCormack Dodge) Series M General Ledger software package. This package provided for 20% to 25% of the MIB system's functional requirements. The remaining percentage was custom developed by the joint team of Andersen and NU personnel. Andersen's final fee to NU was $15,826,601. Andersen contends that $11,711,659 of the $15,826,601 relates to the transfer of computer software as an intangible and therefore is not subject to a sales and use tax. Upon delivery, Andersen transferred to NU all intangible rights to the MIB software, but retained rights to certain tools used in the development of the software. CT Page 1622
From June 1, 1990 to October 31, 1993, CNG and NU made payments to Andersen pursuant to their contracts. Andersen collected sales and use taxes from CNG and NU with respect to the payments under the contracts and remitted the taxes to the commissioner. Andersen claims that the amounts reported as purchases subject to a sales and use tax were in fact nontaxable as a sale of intangible rights to custom computer software, and should be refunded to CNG and NU.
On September 30, 1993, Andersen filed a timely claim with the commissioner for a refund in the amount of $1,438,828, based upon amounts charged in connection with the development and license and/or sale of the custom software itself. This amount consisted of $525,522 with respect to the CNG contracts and $913,306 with respect to the NU contract. The commissioner granted Andersen's refund claim of $76,500 for payments received by Andersen from CNG for license fees, leaving a balance of $449,022. The commissioner denied Andersen's claim for the balance of the refund claimed on behalf of CNG and on any portion of the refund sought by NU. The total refund sought by Andersen in this appeal is $1,362,328.
It is clear from a review of the contracts between the parties that the "true object" of the contracts entered into with Andersen by CNG and NU was to provide computer software programs that would meet their business needs. Andersen did not undertake to provide CNG and NU with services that would meet their objective, but rather developed software programs which in and of themselves would provide CNG and NU with the informational systems to allow them to operate efficiently and cost-effectively now and into the immediate future.
The commissioner has broken down computer software into two categories, computer software services and computer software, finding computer software services taxable and computer software nontaxable. See Department of Revenue Services Ruling 93-1.[2]
Computer software is defined as "any set of binary instructions, codes, programs or routines used to cause a computer to perform a specific task or function." NortheastDatacom, Inc. v. Wallingford, 212 Conn. 639, 640 n. 1,563 A.2d 688 (1989).
General Statutes § 12-71(e), which deals with property tax CT Page 1623 assessment, excludes from taxation all "computer software, except when the cost thereof is included without being separately stated, in the cost of computer hardware." Section 12-71(e) further defines "computer software" to include "any program or routine used to cause a computer to perform a specific task or set of tasks, including without limitation, operational and applicational programs and all documentation related thereto."
Operational and application computer programs as recited in § 12-71(e) are generally considered categories in the definition of computer software. Three categories are generally recognized in defining computer software — systems or operational software, utility software, and application software. C. Reinhard, "Tangible or Intangible — Is that the Question? Conflict in the Texas Tax Classification System of Computer Software," 29 St. Mary's L.J. 871, 889-891 (1998). "[O]perational software controls the overall direction of the computer system. This software tells the computer how to start programs, how to communicate with various hardware devisers and how to perform other basic operational functions." Id., 889-890. Utility software "consists of a variety of general purpose programs that allow the user to sort, transfer, and manage data . . . [and] includes compilers, which translate human-written programs into a language the computer can comprehend." Id., 890. "[A]pplication software consists of programs that are designed to perform specific functions. This type of software enables the computer user to communicate with the equipment. Application software is often described as a task or user oriented program that makes computers more versatile. An example of application software is a word-processing or accounting program." Id., 890-891.
Software is a variety of "literary work," or an original work of authorship, which is distinct from the medium in which the work is fixed. Northeast Datacom, Inc. v. Wallingford, supra,212 Conn. 644. Software programs are "fundamentally a classic form of intellectual property." Id.
Under the ruling of Northeast Datacom, all computer software is nontaxable as intangible property regardless whether the software is "off the shelf" or custom designed. Id., 644-646.
Andersen argues that the effort put into creating a computer software program cannot be categorized as computer services as claimed by the commissioner. Andersen claims that the true object test controls how we look at a complete functional software CT Page 1624 package. Under Andersen's concept of the true object test, the work performed to create a functional software package is incorporated into the final product so that the true object is to produce a final software package. The commissioner agrees with Andersen that the true object test applies in this case; however, the commissioner contends that the true object must be determined from a reading of the contract between the parties and not how the contract was performed. The true object as stated in the contract is, in essence, the true intention of the parties. "The intention of the parties to a contract is to be determined from the language used interpreted in light of the situation of the parties and the circumstances connected with the transaction."HLO Land Ownership Associates Ltd. Partnership v. Hartford,248 Conn. 350, 356, 727 A.2d 1260 (1999).
We find that the object of the underlying transaction in this case was the creation of informational systems for both CNG and NU, not the creation of the various elements necessary to reach the final product. See Hartford Parkview Associates LimitedPartnership v. Groppo supra, 211 Conn. 251-53. CNG obtained a perpetual non-exclusive license to use and modify the software comprising the CIS and DCIS systems. NU obtained a fully functioning MIB system that would perform budgeting, accounting, work order and financial reporting tasks required for its business.
"[T]he sales and use tax purports to tax only certain specifically enumerated services rather than commercial services generally." Hartford Parkview Associates Limited Partnership v.Groppo, supra, 211 Conn. 252. One of the specifically enumerated services in § 12-407(2)(i)(A) is computer and data processing services. The commissioner would have us expand the definition of services to include the creation of computer software. Where the commissioner seeks to expand upon the breadth of items subject to taxation, the commissioner implicates the doctrine that where the issue is the "imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer." Id., 249-50.
Although some jurisdictions distinguish between canned software or "off the-shelf" software versus custom software, NortheastDatacom makes no such distinction. Northeast Datacom involved canned software purchased by the taxpayer, software customized by outside contractors, and custom software developed by the CT Page 1625 taxpayer itself. Northeast Datacom, Inc. v. Wallingford, supra,212 Conn. 642. The court in Northeast Datacom concluded that all of these softwares were intangible personal property, and, therefore, not subject to taxation. Id. In reversing the trial court, the Supreme Court noted that the fact that computer software is made up of a physical component and an intangible intellectual component, does not change its character, which is "fundamentally a classic form of intellectual property." Id., 644.
We conclude that the true object of the contracts between Andersen and CNG and NU was to obtain software programs consisting of intangible intellectual property. The object of the contracts was not to obtain computer services, but rather to develop software programs which, in and of themselves, would direct the performance of the computer systems. As such, these software programs, and the labor used to produce these programs, are not taxable under the sales or use tax statutes. Accordingly, the plaintiff's appeal is sustained, without costs to either party, and the commissioner is ordered to refund to the plaintiff $1,362,328, with interest.
Arnold W. Aronson Judge Trial Referee