[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY
Presently before the court is the plaintiff's, The Stanley Works, application for prejudgment remedy against the defendant, Halstead New England Corporation, dated January 17, 2001. For the reasons stated below, the court grants the application.
 BACKGROUND
The plaintiff seeks a prejudgment remedy on the ground that there is CT Page 6058 probable cause that a judgment in the amount of $136,803.69, or greater, taking into account any known defenses, counterclaims or set offs, will be rendered in this matter in favor of the plaintiff. Accompanying the plaintiff's application for prejudgment remedy is a proposed complaint and an affidavit of Barbara B. Hunnicutt.
This case arises from a written contract (the agreement), dated February 1, 1999. The agreement is a licensing agreement by which the defendant agreed to manufacture and produce both work benches and garden benches under the "Stanley" name. Additionally, the agreement required the defendant to make certain minimum royalty payments to the plaintiff in the event the agreement was terminated. The plaintiff terminated the agreement and seeks the minimum guaranteed royalty payments. To date, the defendant has refused to pay the minimum royalty payments. The plaintiff claims the defendant breached both the agreement and the covenant of good faith and fair dealing. The plaintiff now seeks an attachment or garnishment of any and all cash, stocks, bonds, real or personal property, and any and all bank accounts or investment accounts necessary to secure the amount claimed.
On April 9, 2001, the court held a hearing in connection with the application, at which the parties were present and represented by counsel. At the hearing, the court heard testimony from the plaintiff's witness, Barbara B. Hunnicutt, and the defendant's witness, Harlan Stone. Additionally, the plaintiff submitted the following evidence: the agreement; a licensing approval form, dated July 14, 1999; Hunnicutt's notes from a phone conversation with Harlan Stone, dated January 12, 2000; and a letter from the plaintiff to the defendant, dated September 28, 2000, in which it noted that, in the event of termination of the agreement, the minimum royalty payments, in the amount of $135,000.00, plus interest, would be due. Also, at the hearing, the defendant filed a memorandum of law in opposition to the prejudgment remedy. On April 23, 2001, the plaintiff filed a post-hearing memorandum of law in further support of the prejudgment remedy. The court now issues this decision.
 STANDARD OF REVIEW
"The language of our prejudgment remedy statutes; General Statutes52-278a et seq.; requires that the court determine "whether or not there is probable cause to sustain the validity of the plaintiff's claim'; General Statutes 52-278d (a); that is to say `probable cause that judgment will be rendered in the matter in favor of the plaintiff.' General Statutes 52-278c (a)(2). The legal idea of probable cause is abonafide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable CT Page 6059 cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false." (Citations omitted; emphasis in original; internal quotation marks omitted.) Three S.Development Co. v. Santore, 193 Conn. 174, 175, 474 A.2d 795 (1984).
"It is clear that a `hearing' must allow the defendant an opportunity to present evidence in opposition to the plaintiff's motion for prejudgment remedy." Soltesz v. Miller, 56 Conn. App. 114, 116, 741 A.2d 335
(1999). "[T]he showing of a clear, factually and legally simple defense . . . may be enough to show a lack of probable cause for the validity of a plaintiff's claim." Babiarz v. Hartford Special, Inc., 2 Conn. App. 388,393, 480 A.2d 561 (1984). "It is the trial court that must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a plaintiff has sustained the burden of showing probable cause to sustain the validity of its claim." Nash v. Weed Duryea Co., 236 Conn. 746, 749, 674 A.2d 849 (1996). The trial court has "broad discretion to deny or grant a prejudgment remedy." (Internal quotation marks omitted.) Micci v. Thomas, 55 Conn. App. 14, 16,738 A.2d 219 (1999).
 DISCUSSION
In its memorandum opposing the prejudgment remedy, the defendant raises the following defenses: there is no probable cause to sustain the validity of the plaintiff's claim; the agreement is illusory; the force majeure provisions are contradictory and misleading; the agreement was impossible to perform and thus was void; and the plaintiff violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a, et seq. (CUTPA). In its post hearing memorandum, the plaintiff responds that: the agreement is clear and unambiguous, thereby requiring the defendant to make the minimum royalty payments, and the force majeure provision does not release the defendant from such obligations; the agreement is enforceable because it is not illusory and does not lack consideration; the defendant failed to prove impossibility of performance; and even if the defendant can prove impossibility, the agreement still obligated the defendant to make the minimum royalty payments.
A. The Existence of an Agreement
The defendant argues in its memorandum in opposition to prejudgment remedy that no contract exists between the parties because the alleged contract is illusory and not supported by consideration. The defendant claims the agreement is illusory because the plaintiff was under no obligation to do anything in order to be paid. Furthermore, the defendant argues that the agreement should fail for lack of consideration because CT Page 6060 the plaintiff did not promise to provide a benefit or forbear from doing an act and thus the defendant has no obligation to perform. In response, the plaintiff maintains that it exercised good faith during the approval process and that the agreement had adequate consideration because it granted the defendant an exclusive right to use the "Stanley" trademark, in a particular territory, on or in connection with both its garden and work benches.
"The tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears the parties intended a contract. . . . An implied obligation to use good faith is enough to avoid the finding of an illusory promise." HLO Land Ownership A. Ltd. v.Hartford, 248 Conn. 350, 363, 727 A.2d 1260 (1999). "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." (Citations omitted; internal quotation marks omitted.) Middletown Commercial Associates Ltd.Partnership v. Middletown, 53 Conn. App. 432, 437, 730 A.2d 1201, cert. denied, 250 Conn. 919, 738 A.2d 657 (1999).
In the present case, Harlan Stone testified that he submitted garden bench prototypes to the plaintiff for its approval. In response, the plaintiff suggested some alterations to the product. Harlan Stone further testified that he incorporated the changes and resubmitted the prototypes. He also testified that the garden benches were never approved. He stopped pursuing approval, but always felt welcome to return to the plaintiff's business for additional submissions. Hunnicutt testified that the plaintiff was impressed with the garden bench prototypes and that the plaintiff assisted the defendant in marketing the garden benches by displaying them at a trade show in Chicago. Hunnicutt further testified that the defendant never submitted any prototypes for the work bench but, on January 12, 2000, the defendant did request to relinquish the work bench portion of the agreement. The defendant cited political unrest in Indonesia, the country where the work benches were to be manufactured, claiming that it was unable to import the necessary hardware to manufacture the work bench. After reviewing the record, the court finds, for the purposes of this proceeding concerning the prejudgment remedy application, that the contract is not illusory.
"The doctrine of consideration is of course fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable. In defining the elements of the rule, we have stated that consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise CT Page 6061 is made. . . . An exchange of promises is sufficient consideration to support a contract." (Internal quotation marks omitted.) Keefe v. NorwalkCove Marina, Inc., 57 Conn. App. 601, 606, 749 A.2d 1219, cert. denied,254 Conn. 903, 755 A.2d 881 (2000).
In the present case, the agreement between the plaintiff and the defendant is enforceable because consideration does exist. The agreement provides that the defendant is the exclusive licensee for work benches and garden benches bearing the plaintiff's name. Hunnicutt testified that the "Stanley" trademark is a highly valuable asset and that the plaintiff only enters into licensing agreements after carefully considering potential licensees. Upon signing the agreement, the plaintiff gave the defendant a valuable asset and agreed to forego the opportunity to have other licensees use its trademark for similar purposes in the same territory as the defendant.
Defendant argues also that paragraph 5.1.8 of the agreement, concerning the approval process, demonstrates that there is no consideration since the plaintiff has no obligation to approve anything submitted and defendant has no remedy in the event of such a refusal. In that part of the agreement, defendant agreed that it "shall not have any rights against OWNER [The Stanley Works] for damages or other remedy by reason of OWNER's failure to grant any approval referred to in this Paragraph." (Exhibit 1, License Agreement, par. 5.1.8, p. 6) Rather than reflect a lack of consideration, this section of the contract further evidences defendant's assent, in paragraph 5.1.3 of the agreement that "OWNER, in its sole discretion, reserves the right to reject an item approved at a prior stage if it departs from the approved sample." (Exhibit 1, License Agreement, par. 5.1.3, p. 6)
In this commercial context, the parties were free to bargain for whatever terms they wished. The defendant voluntarily undertook the agreement in order to become a Stanley licensee. "It is axiomatic that courts do not rewrite contracts for the parties. . . ." (Internal quotation marks omitted.) Gibson v. Capano, 241 Conn. 725, 732, 699 A.2d 68
(1997). Likewise, the court may not decline to enforce an agreement which affords one party "sole discretion" as to a key element thereof "because it is susceptible of an application that it is advantageous to one [party] and disadvantageous to another." Konover Development Corp. v.Zeller, 228 Conn. 206, 230, 635 A.2d 798 (1994). As noted above, the plaintiff had an implied duty to act in good faith; this duty also applied to the approval process. The record reflects that the plaintiff did so; apparently, the defendant chose not to continue to seek approval. Accordingly, the court finds that valid consideration exists for the formation of an enforceable contract between the parties. CT Page 6062
B. The Language of the Agreement
The parties disagree about whether the language of the agreement is clear and unambiguous, specifically the force majeure provision.[1]
"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . Our case law, however, does not set forth a test by which to determine whether contract language is sufficiently definite to warrant its review as a question of law rather than as a question of fact. It is noteworthy that, in the majority of the cases considering contract interpretation a matter of law, the disputed agreement was a commercial contract between sophisticated commercial parties with relatively equal bargaining power." (Citations omitted; internal quotation marks omitted.)Tallmadge Bros. v. Iroquois Gas Transmission System, 252 Conn. 479,495-96, 746 A.2d 1277 (2000).
In the present case, the parties are sophisticated commercial parties who negotiated a commercial contract. The plaintiff hired Michael Stone (who is not related to Harlan Stone) of The Beanstalk Group, Inc., an experienced licensing firm, to act as its agent and negotiate the agreement with the defendant. Furthermore, Barbara Hunnicutt, the person who signed the agreement on behalf of the plaintiff, has twenty-two years experience in trademark licensing. Harlan Stone, the president, chief operating officer and negotiator for the defendant, testified that he has been in business since 1991. Additionally, Harlan Stone testified that this was not the first contract that he had negotiated and that he specifically negotiated the force majeure provision.
The force majeure provision states, in its second paragraph, that: "In the event either party is unable to perform its obligations . . . either party hereto may terminate this Agreement, which termination shall relieve each party of any liability to the other based upon such termination; however, LICENSEE shall not be released from any of its obligations to make ROYALTY PAYMENTS or any other payments to OWNER pursuant to the terms and conditions of this Agreement."
"Our interpretation of [the force majeure provision] is guided by well established principles of contract law. A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly CT Page 6063 applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) Tallmadge Bros. v.Iroquois Gas Transmission System, supra, 252 Conn. 498.
In the present case, the plain language of the force majeure provision is clear and unambiguous. It states that upon termination the "LICENSEE", the defendant in the present action, is not released from its obligation to make the royalty payments otherwise provided for in the agreement. The final clause, beginning with the word "however," clearly was meant to modify what came before it. Moreover that clause is consistent with paragraph 3.3 (p. 2), which provides that, "The minimum ROYALTY PAYMENTS set forth in this Paragraph are obligations of LICENSEE to OWNER and are fully earned by OWNER upon execution of this Agreement." As such, the contract must be given effect according to those terms.
At the hearing, Harlan Stone testified that the force majeure provision, as it presently is constituted, was not in the original draft of the agreement but rather was crafted through negotiations with Michael Stone. Harlan Stone also testified that he did not understand the last sentence of the force majeure provision and that he did not understand that it would not release him from his obligation to make royalty payments. Given Harlan Stone's lengthy experience in the business and the unambiguous language of the provision, the court is unpersuaded. The evidence is clear that the parties intended to do exactly what the contract states: bind the defendant to the minimum royalty payments in the event of a termination.
After reviewing the record, the court concludes that the parties meant what they said and said what they meant, in language sufficiently definitive to demonstrate the parties' intent. They intended that the defendant remit royalty payments to the plaintiff in the event the agreement is terminated.
C. Impossibility of Performance
The defendant argues that, even if a contract exists, the political climate in Indonesia at the time rendered the defendant's performance impossible. As such, the defendant argues that the court cannot find probable cause that the plaintiff will prevail on its claim because the agreement is voidable for legal impossibility. Under the present facts, the impossibility of performance was clearly contemplated by the parties CT Page 6064 as is evidenced by the plain language of the force majeure provision. The force majeure provision states, "LICENSEE shall not be released from any of its obligations to make ROYALTY PAYMENTS." Accordingly, the court does not reach the validity of the defendant's impossibility defense because the plain language of the agreement obligates the defendant to pay the royalty payments regardless of whether there was political unrest in Indonesia.[2]
 CONCLUSION
Accordingly, the court finds that the plaintiff has shown the requisite probable cause to believe that it will recover judgment. Under paragraph 3.3 (p. 2) of the agreement, the defendant agreed to pay the plaintiff the minimum guaranteed royalty payments set forth on Exhibit 3 to the agreement. Exhibit 3 of the agreement provides that the remaining "Guaranteed Payments" (excluding a $15,000 advance payment) amount to $135,000.00. Paragraph 14 (p. 13) provides that, upon termination of the agreement, balances owing on minimum guarantees shall be immediately due and payable. Paragraph 3.8 (p. 3) requires the defendant to pay interest on all past due amounts. The defendant has not disputed either the plaintiff's calculation of the principal amount due or the calculation of the interest owed on past due amounts. For the foregoing reasons, the plaintiff's application for prejudgment remedy is granted in the amount of $137,257.15, representing $136,803.69 plus $453.46 ($5.53 per day from the date of the application, January 17, 2001, to April 9, 2001, the date of the hearing). It is so ordered.
BY THE COURT,
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT