[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision Re: Plaintiff's Motion to Compel dated April 2, 2002
The front page of the December 31, 2002 edition of the Hartford Courant featured an article which reported that the end of year 2002 marks the third straight annual decline in the Dow Jones average. With this motion the plaintiff asks the court to determine who will bear the enormous loss in value of the defendant's pension plan caused by this falling stock market of 2000-2002.
I. Procedural Background
The marriage of the parties was dissolved on September 7, 2000. The judgment incorporated the parties' separation agreement dated August 30, 2000. That agreement included provisions for the transfer to the plaintiff of a portion of the defendant's pension. This transfer has never taken place. The plaintiff has filed a motion to compel dated October 2, 2001 in which she seeks to compel the defendant to transfer to her one-half of the pension at its December 31, 1999 value, less certain credits. The defendant claims that the transfer should take place at current values. An evidentiary hearing was held, and the parties filed simultaneous briefs on October 25, 2002 followed by simultaneous reply briefs on November 12, 2002.
II. Relevant Portions of the Agreement
Section 8 of the separation agreement reads as follows:
"8. Retirement Benefits — Asset Division: The Husband shall transfer to the Wife so much of the accrued benefits in his pension, retirement, 401k, IRA or similar plan (hereinafter "Pension Plan") so that the wife receives fifty percent (50%) of the combined after tax value of all of the parties assets (exclusive of the household goods and furnishings CT Page 1117 located at 30 Mohawk Drive, West Hartford, Connecticut, artwork in the husband's office condominium; each parties jewelry and personal effects and the artwork and antiques and business interests as set forth in paragraphs 9 and 10 hereof) as of December 31, 1999 plus any increase in the value of said pension plans through the date of division, including all 1999 contributions. Said transfer shall be by way of a Qualified Domestic Relations Order or other tax free method of transfer (hereinafter "QDRO") as may be permitted or required by the husband's employer or pension plan administrator. The Court shall retain jurisdiction over this matter to amend the judgement and any QDRO orders entered in connection therewith in order to establish and/or maintain the qualifications of the QDRO under applicable law and to otherwise fulfill the intent of this provision. Exhibit A hereof is a list of the assets, together with their agreed upon values and party receiving each asset, which will be considered in making said adjustment from the pension plan.
Except as above, the parties expressly waive any interest they may have in any individual retirement accounts, employee savings, retirement, pension, profit sharing, or similar plans that they may be entitled to through their respective employers.
Exhibit A reads as follows:
 HUSBAND WIFE ------- ----
Real Estate (Equity) $ 63,000 $374,000 (condos) (marital home)
Automobiles (Equity) $ 34,000 $ 8,000
Cash Value Life Insurance $ 50,000 $ 30,000 CT Page 6416
Schwab Account (Husband) $240,000 $120,000
Schwab Account (Joint) $ 0 $ 7,000 -------- --------
Total $387,000 $539,000
Grand Total of Assets
Husband and Wife $926,000
One-half $463,000 $463,000
Net after tax adjustment for Husband $ 76,000
After tax adjustment in favor of Husband (to equalize after tax value of assets) $108,571
All limited partnerships and investments with Stan Sadlak Co. are to be divided equally." CT Page 1118
Section 18 of the separation agreement, entitled "Acknowledgment of Representation," states in relevant part:
 "Both parties acknowledge that they have gone over this agreement with their respective counsel and are satisfied with this agreement and the advice of their counsel and the advise of [sic] representation of their respective attorneys. Both parties agree that they have had the opportunity to have the financial provisions contained herein reviewed by an accountant or other tax expert regarding the tax effect of those provisions . . .
Section 21 of the separation agreement provides:
 21. Entire Agreement: This Agreement and Stipulation contains the entire understanding of the parties hereto, and no oral statement or prior written matter shall have any force or effect hereon. The parties confirm that there are no representations, warranties, covenants or undertakings other than those expressly set forth herein."
III. FACTS
In January or February of 1999 the plaintiff retained Attorney Eliot Nerenberg to represent her in this action for dissolution of marriage. The defendant retained Attorney Bruce Beck to represent him soon after the action was returned to court in March 1999. In order to attempt to CT Page 1119 facilitate a settlement, the parties agreed to mediate the matter with Robert Colucci, former head of the Hartford Family Relations Office, as a private mediator. For a period of roughly one year, both pre and post judgment, Mr. Colucci conducted several mediation sessions.
The first mediation session with Mr. Colucci relevant to the pending matter occurred on December 20, 1999. The defendant prepared and presented a financial affidavit at this session which showed his Keogh Plan ("the Plan") to have a value of $862,000 although the Plan value as of November 30, 1999 was $964,217 and its value as of December 31, 1999 was $1,103,460. The defendant submitted the same affidavit to the court at a pendente lite hearing on December 22, 1999. The defendant acknowledges that his financial affidavit was in error although there was no evidence of the actual plan value on December 20 and 22, 1999. The Plan was held by Charles Schwab and administered by Stan Sadlak Co., but the defendant made the investment decisions. He received monthly statements of its value and asset allocation. The defendant did not have a credible reason for his erroneous financial affidavit.
The defendant made trades in the securities in the Plan until March 2000. No changes in the Plan investments have been made since that time. The Plan is heavily invested in stocks, the value of which continued to fall with the bear market.
At or immediately following the mediation session on December 20, 1999 the parties reached a preliminary agreement on a framework for distribution of the major assets of the marriage. This framework called for the assets to be divided equally at their values on December 31, 1999. Because the assets each party would be getting had different values, the Plan was to be used as a "swing asset" to adjust for any differences in asset values. A draft stipulation was prepared by Attorney Beck soon after the mediation session which provides for the defendant to transfer to the plaintiff so much of the retirement benefits including the Plan so that the plaintiff receives 50% of the combined after tax value of all the parties assets (with enumerated exceptions) valued as of December 31, 1999. The parties hoped that they would be able to finalize their agreement and go to judgment in January 2000.
Then in late December 1999 or early January 2000 Attorney Nerenberg withdrew from the case and was replaced by an attorney who attempted to include the value of the defendant's medical degree as an asset subject to division. The defendant rejected this attempt. Negotiations bogged down and the case was scheduled for trial on September 7, 2000.
Then, near the end of August 2000, the plaintiff rehired Attorney CT Page 1120 Nerenberg. The parties immediately scheduled another mediation session with Mr. Colucci on August 29, 2000. The defendant prepared and presented a financial affidavit at the mediation which showed the value of the Plan to be $940,000. The mediation session produced a tentative agreement along the same lines as the framework discussed in December 1999. Following the session the attorneys discussed the draft stipulation and, after exchanging requests for changes, agreed on two modifications to Section 8, the section dealing with the split of the retirement benefits. The first is not significant but the second was the addition of the words "plus any increase in the value of said Pension Plans through the date of division, including all 1999 contributions." The attorneys agreed that this language was necessary in order for the plaintiff to agree to sign the separation agreement. The attorneys never discussed adding the words "or decreases" to this additional language.
Prior to signing the revised separation agreement the plaintiff discussed it with her older brother, Kenneth Frohlich. Mr. Frohlich was the chief actuary for a group of insurance companies and acted as the plaintiffs advisor throughout the dissolution. They specifically discussed Section 8 and the valuation date of December 31, 1999. Mr. Frohlich explained to the plaintiff that she would not need to worry about the amount to be transferred to her by QDRO; the valuation date of December 31, 1999 guaranteed her a fixed sum of money from the Plan plus any increases in value since December 31, 1999. He told her that she could never receive less than the December 31, 1999 value, and might get more if there were increases in value. The plaintiff and Mr. Frohlich estimated that her share of the Plan would be close to $500,000.
The parties signed the separation agreement prior to a meeting with the presiding judge at the end of August. After this meeting, in the hallway, the plaintiff told Attorney Nerenberg that they had forgotten to address some limited partnerships and tax shelters owned by the parties and managed by Stan Sadlak Co. The attorneys discussed this issue at that time and decided to deal with these investments separately because they had limited value or were of unknown value. The attorneys then added the following sentence to Exhibit A: "All limited partnerships and investments with Stan Sadlak Co. are to be divided equally." The addition of this language was not intended by the parties or the attorneys to relate to retirement benefits.
The case went to judgment on September 7, 2000 and both parties were canvassed by their attorneys. With respect to retirement benefits, Attorney Nerenberg had the following colloquy with the plaintiff as part of a longer canvas:
CT Page 1121
Q. Has it been agreed that between your IRA's and your husbands IRA's, pension, retirement, 401k's, with similar pension plans, you're going to receive 50 percent of the combined after tax value of those assets — of all the assets as set forth on the attached schedule, is that correct?
A. Yes.
 Q. The way you'll get your share, or if you owe him money, his share, will be by an adjustment in the QDRO. But the whole idea is a 50/50 split of all of those assets, is that correct?
A. Yes.
 Q. We've agreed that, in determining the value of the assets — we've agreed on values as per the schedule, but for the QDRO — I'm sorry — for the IRA's or pension plans, we're going to use the December 31st, 1999 value, but we're going to see what it's increased until the day we actually divide it of interest or dividends that have increased or decreased. Is that correct?
A. (No audible response.)
Q. You have to speak up.
A. Yes.
The court concludes that Attorney Nerenberg's use of the word "decreases" in the last question was an inadvertent misstatement. His use of the word "decreases" is inconsistent with the remainder of the question and with the language of the separation agreement which specifically mentions increases only.
Later, as part of a longer examination, Attorney Beck questioned the defendant as follows:
 Q. Dr. Breiter, you heard your wife's attorney ask her questions about the agreement?
A. Yes. CT Page 1122
 Q. You've gone through the agreement with me, have you not?
A. Yes.
 Q. And we've done this on several occasions, haven't we?
A. Yes.
 Q. This agreement we're asking Judge Cohen to approve today, it's been the product of several months of negotiations, is that correct?
A. Yes.
 Q. In fact, we've had about a half a dozen sessions with Bob Colucci, in terms of trying to come to a final agreement, is that correct?
A. Yes
The financial affidavits submitted to the court on the day of judgment reveal that both parties held IRA accounts with nearly equal values of a little more than $18,000 each. The defendant's financial affidavit showed a Plan value of $928,000. There was no evidence of the actual value of the Plan on the day of judgment but the value on August 31, 2000 was $954,062.43. The value of the Plan dropped each month through the and of 2000 and had a value of $574,782.29 on December 31, 2000, having lost nearly 50% of its value since the valuation date of December 31, 1999.
The parties held a Picasso print in the Plan which the plaintiff wanted to keep as part of the settlement. Therefore, its value was necessary to fully establish the value of the Plan for the purpose of distribution. The parties agreed to meet with Mr. Colucci to, among other things, establish the value of the Picasso. The meeting took place in late October 2000 and produced an agreement that the value of the Picasso was $18,000, a fact communicated via fax by Attorney Beck to Attorney Nerenberg on October 26, 2000. Although there were some upward monthly fluctuations during 2001, on December 31, 2001 the value of the Plan had fallen to $443,349.61. Although the parties did not offer any of the monthly statement since that time, the parties agreed that the value of the Plan had dropped below $400,000 at the conclusion of the hearing on this motion. CT Page 1123
The attorneys never had a specific agreement about the responsibility for preparation of the QDRO. This becomes important because the defendant claims that Attorney Nerenberg had the responsibility for preparation of the QDRO and that he delayed in preparing it while the value of the Plan fell. Therefore, the defendant claims that the plaintiff should bear the full loss in value occasioned by this delay. After listening to the testimony of both attorneys, reviewing the transcript carefully, and studying the exchanges of correspondence which took place over several months following the dissolution it is clear that both attorneys believed that the other one would prepare the QDRO. Neither confirmed this belief in writing. There is nothing in the judgment which obligates either party to prepare the QDRO. Neither attorney acted decisively to get this issue of the QDRO resolved. It wasn't until February 2001 that the attorneys even realized that they had a fundamental disagreement about the meaning of Section 8. Even then, neither attorney seemed to grasp the magnitude of the losses being sustained by Plan and the difficulty these losses would present in preparing the QDRO. After giving the defendant the credits to which he is entitled, the defendant would be obligated to transfer to the plaintiff by QDRO the sum of $488,445 if December 31, 1999 is used as the date of validation.
It wasn't until May 31, 2001 that the defendant filed a motion to clarify or correct the judgment on the ground that the valuation date of December 31, 1999 did not reflect the true intent of the parties. This motion was never heard. On October 2, 2001 the plaintiff filed the pending motion to compel. On May 14, 2002 the court found that the language of Section 8 and Schedule A are unambiguous and granted, in part, the plaintiffs motion in limine to prevent the defendant from offering evidence to contradict that language. However, the court permitted the defendant to offer evidence of 1) mutual mistake, 2) an alleged latent ambiguity in Schedule A.
IV. Discussion
A. General Principles
The language of the separation agreement incorporated in the judgment is to be regarded and construed as a contract. Issler v. Issler,250 Conn. 226, 235 (1999). Accordingly, resolution of the plaintiffs claim "is guided by the general principles governing the construction of contracts. A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the CT Page 1124 language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." Id.
The language of Section 8 and Schedule A of the agreement is clear and unambiguous. The Plan is to be valued as of December 31, 1999 plus any increase in value through the date of division, including the 1999 contributions. The defendant is obligated to transfer to the plaintiff as much of the Plan as is necessary so that the plaintiff receives 50% of the combined after tax value of the assets listed on Schedule A. There is nothing ambiguous about this language. "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." Aubin v. Miller, 64 Conn. App. 781, 793-94
(2001), quoting Tallmadge Brothers, Inc. v. Iroquois Gas TransmissionSystem, L.P., 252 Conn. 479, 498 (2000) [internal quotation marks and citation omitted].
Therefore, the contract must be given effect according to its terms unless it can be shown that the stipulation was obtained by fraud. accident or mistake. Gillis v. Gillis, 214 Conn. 336, 340 (1990).
B. Adverse Inference
Both parties ask the court to draw an adverse inference against the opposing party because neither party called the plaintiff as a witness. The court declines to draw an adverse inference against either party. The plaintiff was available to testify because she sat at counsel table throughout the hearing. However, it is not clear to the court that either party would naturally be expected to call the plaintiff as a witness. There are sufficient tactical reasons for neither party to be inclined to call the plaintiff as a witness. "[T]he missing witness rule is predicated upon the questionable assumption that a party's failure to call a particular witness is due to the fact that the witness' testimony would be adverse to that party. Contrary to that assumption, there are many reasons why a party may choose to refrain from calling a witness that have little or nothing to do with the substance of the witness' testimony." State v. Malave, 250 Conn. 722, 734 (1999).
C. Mutual Mistake
The defendant's primary defense is mutual mistake. "A judgment rendered CT Page 1125 upon a stipulation of the parties is in the nature of a contract and may be opened by the court if the stipulation was entered into by mutual mistake. Kenworthy v. Kenworthy, 180 Conn. 129, 131, 429 A.2d 837
(1980); see also O'Leary v. Industrial Park Corporation, 211 Conn. 648,652-53 Page 708 n. 2, 560 A.2d 968 (1989). A mutual mistake is one that is common to both parties and effects a result that neither intended.Lopinto v. Haines, 185 Conn. 527, 532, 441 A.2d 151 (1981). Whether there has been such mistake is a question of fact. See McWilliams v. AmericanFidelity Co., 140 Conn. 572, 579, 102 A.2d 345 (1954); see also Weld v.Melly, 16 Conn. App. 555, 557-58, 548 A.2d 14 (1988)." Inland WetlandsAgency v. Landmark Investment Group, 218 Conn. 703, 707-708 (1991). "To warrant the reformation of a contract on the ground of mutual mistake, the mistake must have been common to both parties, and it must appear that by reason of it both have done what neither intended, and the evidence should be clear, substantial, and convincing as to both these facts." Snelling v. Merritt, 85 Conn. 83, 100, 81 A. 1039.
The defendant contends that at the time judgment was entered, the parties were acting under the mistaken assumption that the value of the Plan had increased substantially since December 31, 1999. The defendant points to his affidavit of December 20, 1999 showing a value of $862,000 and his affidavit of August 29, 2000 showing a value of $940,000. He argues that the parties relied upon these affidavits to form a mistaken belief that the value of the Plan had risen since December 1999, and that this was the reason that the parties kept the valuation date of December 31, 1999 and added the words "plus any increase in value of said Pension Plans through the date of division, including all 1999 contributions." He contends that this language would have accurately reflected the agreement of the parties if the facts had been as both parties assumed, i.e. that the value of the Plan had increased. He argues that if the parties had known that the value of the Plan had fallen they would have used different language to reflect their understanding that all assets, including the Plan, were to be divided equally.
The plaintiff disputes that the parties were mistaken about the value of the Plan on December 31, 1999. The defendant received a November 30, 1999 statement from Charles Schwab showing that the value of the Plan was $964,217 on that date. It is not clear why the defendant showed a value of $862,000 on his December 20, 1999 sworn financial affidavit. If he had not received his November 30 statement prior to preparing his sworn financial affidavit he could have called Charles Schwab to get an accurate value. Certainly in January 2000, when he received his year-end statement from Charles Schwab showing the value of the Plan, the defendant knew that the value of the Plan on December 31, 1999 was, in fact, $1,103,460. It is not credible that he mistakenly believed that CT Page 1126 Plan grew in value from December 31, 1999 to the date of judgment on September 7, 2000.
The defendant concedes that any mistake by the parties about the value of the Plan on December 31, 1999 was caused by the defendant's inaccurate financial affidavit in December 1999. But he cites Geremia v. Boyarsky,107 Conn. 387, 391 (1928) for the following proposition: "As a general rule a party will not be given relief against a mistake induced by his own culpable negligence. But the rule is not inflexible and in many cases relief may be granted although the mistake was not unmixed with some element of negligence, particularly when the other party has been in no way prejudiced. The conclusion from the best authorities seems to be, that the neglect must amount to the violation of a positive legal duty. The highest possible care is not demanded." But the defendant's neglect in this case did amount to violation of a positive legal duty to file an accurate sworn financial affidavit. See, Practice Book Section 25-30. The preparation of a sworn financial affidavit for submission to the court does require the highest possible care. "Where the parties are in agreement as to the division of the marital property and as to alimony and support, the sworn financial statements of the parties assume great significance since they are submitted in lieu of testimony under oath. Accordingly, compliance with the rules concerning the filing of financial affidavits is essential in order for the court to make a reasoned decision with respect to such orders." Grayson v. Grayson,4 Conn. App. 275, 287 (1985). The defendant cannot now claim that he should be given relief from the enforcement of an unambiguous agreement on the ground of an alleged mutual mistake caused by an erroneous sworn financial affidavit that he had a positive legal duty to file accurately.
Nor did the defendant prove by clear, substantial, and convincing evidence that the plaintiff was mistaken about the value of the Plan. Although she never testified, her brother, Kenneth Frohlich, reported to her that the defendant had told him during the dissolution that the value of the Plan was about $1,000,000. In order to rely on mutual mistake for relief, the defendant had the obligation of proving that both parties were mistaken about an essential fact. The defendant failed to carry this burden.
However, it is clear is that Attorney Beck was unaware that the Plan had decreased in value. He relied upon the defendant's sworn financial affidavit to conclude that the value of the Plan had increased. He had no reason to know that, in fact, the value of the Plan had decreased since December 31, 1999. But, the parties were not mistaken. In summary, the defendant was not able to prove that there was mutual mistake as to the CT Page 1127 investment history of the Plan between December 31, 1999 and the date of the judgment.
It is interesting to note that the defendant does not claim in his post-trial briefs that the December 31, 1999 valuation date in the agreement was a mutual mistake. Prior pleadings in the file and the testimony of the defendant seemed to indicate that the defendant's position was that the December 31, 1999 valuation date was a scrivener's error caused by a failure to carefully revise a prior draft of the agreement. However, the defendant's Reply Memorandum dated November 12, 2002 makes it clear that he is not claiming a mistake in the terms of the agreement. The defendant states on page 17 of the memorandum: "Defendant's argument, and the proof adduced at trial, was very focused as to the nature of the mutual mistake: namely, that at the time the parties negotiated the final agreement in late August through September of 2000, they were both mistaken as to the Plan's investment experience since December 31, 1999."
Although the defendant's position seems clear, the court feels it must briefly address the issue of whether there was a mutual mistake about the language of the agreement. There is no question that the defendant was mistaken in his understanding of the of the language of the agreement. He was convincing in his testimony that he thought that the Plan would be divided at current values. He read the agreement but simply did not appreciate the effect of the December 31, 1999 valuation date. He pointed out that he would not knowingly agree to pay the plaintiff 50% of the Plan at a value which was approximately $170,000 higher than the current value. But, perhaps the defendant does not rely upon this mistake because it is also clear that the plaintiff was not mistaken about the language of the agreement. Based upon the testimony of Mr. Frohlich, the plaintiff relied upon the December 31, 1999 valuation date in evaluating whether to sign the agreement. Therefore, although the defendant was mistaken about the terms of the agreement, the plaintiff was not. The doctrine of mutual mistake would not apply. A unilateral mistake about the terms of the agreement would not suffice to excuse the defendant's performance.Solomon v. Keiser, 22 Conn. App. 424, 427 (1990).
D. Unilateral Mistake
The defendant further argues that even if the plaintiff and Attorney Nerenberg knew that the value of the Plan had declined from December 31, 1999 to the date of judgment, the defendant is still entitled to relief from the motion to compel on the ground of unilateral mistake by the defendant coupled with actual or constructive fraud, or inequitable conduct on the part of the plaintiff. It is true that a cause of action CT Page 1128 for reformation of a contract can rest upon mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other. Traggis v. Shawmut Bank of Connecticut, N.A., 72 Conn. App. 251,258 (2002). But, this legal theory has no application to this case where the defendant, the party seeking relief, was not mistaken about the true facts. As discussed above, the defendant knew exactly what was happening to the value of the Plan because he received monthly statements from Charles Schwab. His claim that he was mistaken as to value is not credible. He is in no position to claim that he was mistaken about the value of the Plan because not only did he receive monthly valuation statements, he was making trades in the securities in the Plan during the time that he claims to have been mistaken about the Plan's value. This is not believable.
Nor was there any evidence that the plaintiff was involved in any actual or constructive fraud or any inequitable conduct. It would have been the defendant's burden to prove such conduct in order to establish his defense. The defendant failed to sustain his burden.
E. Latent Ambiguity
The defendant argues that the language added to Schedule A regarding Stan Sadlak creates a latent ambiguity which permits the court to conclude that the parties always intended to divide all of their assets equally at current values. This argument must be rejected because the evidence clearly established that there is in fact no ambiguity in the language added to Schedule A. The sentence which was added to Schedule A states: "All limited partnerships and investments with Stan Sadlak Co. are to be divided equally." The Plan was not an investment "with Stan Sadlak." Although Stan Sadlak administered the Plan, the investments were actually "with" Charles Schwab which effectuated all trades and prepared all monthly valuations. Administration of the plan only required Sadlak to prepare all of the yearly paperwork. The language added to Schedule A was for the sole purpose of dealing with some limited partnerships and tax shelters of little or uncertain value which the parties had forgotten about when the separation agreement was prepared and signed. Both parties were aware that the addition of this language had nothing to do with the division of retirement assets. The division of the retirement accounts including the Plan was specifically made under Section 8 of the agreement, not under this one sentence added to Schedule A after the agreement was already signed.
F. Laches
Next the defendant claims that the plaintiff has been guilty of laches CT Page 1129 as a result of her alleged delay in implementing the QDRO so as to bar her from the relief sought. The problem with this argument is that the delay in implementing the QDRO was equally defendant's fault. The judgment did not specify how the QDRO was to be prepared. The attorneys never reached an agreement about who would prepare the QDRO. There was nothing to stop Attorney Beck from preparing the QDRO. There was no court order that it could only be prepared by the plaintiff. The defendant could have filed a motion for contempt if he thought that the plaintiff had a legal obligation to prepare it.
Laches is an equitable remedy. "Equity will not relieve against the operation of judgments rendered through the negligence or inattention of the party claiming to be aggrieved or his attorney." (Citations omitted)Palverari v. Finta, 129 Conn. 38, 43 (1942). If there is fault to be assigned for the delay in implementing to QDRO, it is shared by the attorneys. Equity is not available to aid the defendant in this circumstance.
G. Change of Circumstances
The defendant argues that the circumstances have changed so dramatically since the date of judgment that, even if the original intent was to divide the Plan as of December 31, 1999, that date should no longer be utilized for purposes of the asset division. The value of the Plan has dropped so low that there may be insufficient funds to transfer to plaintiff the total 50% of the December 31, 1999 value. Therefore, the defendant claims that the court should utilize the doctrine of impossibility of performance to relieve the defendant of his obligation under the judgment to transfer a portion of the Plan to the plaintiff at December 31, 1999 values.
In support of this claim the defendant cites Aetna Casualty Surety Co. v. Murphy, 206 Conn. 409, 413 (1988). This case involves whether an insured may be excused from the notice provision of an insurance policy if there is no prejudice to the insurer. The Court relied, in part, upon the Restatement (Second) of Contracts (1981) Section 229 for the proposition that: "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Id. at 413, footnote 2. The court also relied upon the fact that an insurance policy is a contract of adhesion to conclude that the literal enforcement of the notice provision may be excused if the insured can prove that the notice provision was not a material part of the agreed exchange, and that the insurer has not been prejudiced. Id. at 417-418. That holding is not CT Page 1130 applicable to the facts of the case at hand. This agreement is not one of adhesion. It was negotiated by sophisticated, wealthy parties using experienced attorneys. Here the defendant is not seeking relief from a condition which is not "a material part of the agreed exchange." The valuation date of December 31, 1999 is a material part of the agreement and judgment. In agreeing to the proposed dissolution the plaintiff relied upon her brother's advise that the valuation date was extremely advantageous to her because it provided her with a guaranteed sum from the Plan. Unlike the failure to give notice of loss to an insurance company which may not be prejudicial, the failure to transfer the Plan at December 31, 1999 values is necessarily of great prejudice to the plaintiff. Therefore, the court can not rely upon Aetna Casualty Surety Co. v. Murphy, supra, to grant relief to the defendant.
The defendant also cites Roy v. Stephen Pontiac-Cadillac, Inc.,15 Conn. App. 101 (1988) for the proposition that the doctrine of impossibility has come to include impracticability. That case involves the inability of the defendant automobile dealer to fulfill an order to deliver a specially-ordered truck. Because the case involved the sale of goods, the decision was based upon the Uniform Commercial Code. Id. at 104. The facts are quite different from those in the present case.
It is true that the law has developed a good many exceptions to the rule that a contract must be performed according to its terms even if performance has become impossible or impracticable. See, 17 Am Jur 2d, Contracts, Section 677. Section 261 of the Restatement, Contracts 2d, entitled "Discharge by Supervening Impracticability" provides:
 Where, after a contract is made, a party's performance is made impracticable without fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or circumstances indicate the contrary.
But application of this section to the facts of this case is not possible for two reasons. First, the defendant's performance of his obligation is not impracticable. There is enough left in the Plan to transfer to the plaintiff by QDRO approximately 75% of the total amount due. The shortfall can be made up with a cash payment net of taxes. See,Brewster v. Brewster, 2002 WL 237661 (Gruendel, J.) Second, it was not a basic assumption on which the contract was made that the value of the Plan would never decrease. Like most American investors, the parties may have been lulled into a false sense of security about the safety of the stock markets during the 1999's. But, the defendant did not prove that CT Page 1131 these parties made the concept of a risk-free stock market a basic assumption on which the contract was based. On the contrary, the testimony of Mr. Frohlich indicated that he discussed with his sister that this contract was advantageous to her because it protected her against a decrease in the value of the Plan. So at least the plaintiff was not assuming that the stock market would just keep rising.
In Magowan v. Magowan, 73 Conn. App. 733 (2002) the Appellate Court recently discussed the opening of a judgment based upon an alleged mutual mistake by the parties in thinking that the defendant would be able to continue to live in a property owned by a trust of which the plaintiff husband was a beneficiary. The Appellate Court upheld the trial court's finding that there was no mutual mistake because the plaintiff knew the terms of the trust that did not entitle him to demand that the defendant continue to live in trust property. The court stated:
 "The facts of this case are similar to those in Barnett v. Barnett, 26 Conn. App. 355, 600 A.2d 1055
(1992). In Barnett, the defendant argued that the trial court improperly denied a motion to open and to set aside an award of lump sum alimony based upon a mutual mistake as to the amount of equity in the marital home. Id., 355-56. The defendant had expected to be able to sell the marital home for more than was received at a foreclosure sale and, thus, to use those funds to pay the lump sum alimony. Id., 357-58. This court stated: At best, the defendant's position amounts to a claim that the judgment should be opened and set aside on the ground of impossibility of performance because he does not the money to carry out the agreement. . . . The defendant has furnished us with no Connecticut authority, nor are we aware of any, that allows a party to avoid payment of a judgment on the basis of impossibility of performance due to lack of funds." Id. at 739-40 (internal quotation marks omitted).
The facts in this case are similar to Barnett and Magowan. There was no mutual mistake because the defendant was always aware of the value of the Plan. The defendant's claims of impossibility, impracticability, or change of circumstances are based, essentially, upon a realization that he will suffer a large unanticipated monetary loss if the agreement is enforced. The defendant has not furnished any authority, nor is this court aware of any, that allows a party to avoid performance under a judgment on the basis that economic circumstances have changed so much CT Page 1132 that it will be substantially more costly than he anticipated.
H. Relief
The defendant is ordered to transfer from the Plan to the plaintiff by qualified domestic relations order within 30 days the sum of $488,445. If there is a shortfall caused by the diminished value of the Plan, the defendant shall make up the difference by paying the plaintiff a sum sufficient to net her the amount of the shortfall, net of taxes.
___________________ John W. Pickard Judge of the Superior Court CT Page 1133